EL PUEBLO DE PUERTO RICO, demandante y peticionario, *v.* HENRY YIP BERRÍOS, acusado y recurrido.

*Número:* CE-93-735 *Resuelto:* 30 de enero de 1997

*Pedro A. Delgado Hernández, Procurador General,* abogado del peticionario; *Carmen Ana Rodríguez Maldonado,* de la *Sociedad para la Asistencia Legal,* abogada del recurrido.

Opinión del Tribunal emitida por el Juez Asociado Señor Hernández Denton.

El Ministerio Público nos solicita que revoquemos una resolución del anterior Tribunal Superior, Sala de Bayamón, mediante la cual se suprimió cierta evidencia incautada por la Policía de Puerto Rico, luego de que Henry Yip Berríos fuera detenido en un bloqueo vehicular efectuado en las carreteras que daban acceso al residencial público Virgilio Dávila de Bayamón. El tribunal a quo concluyó que la evidencia fue obtenida en violación de la garantía constitucional contra registros, incautaciones y allanamientos irrazonables, ya que la detención fue efectuada sin que la Policía tuviera motivos fundados para creer que el imputado hubiera cometido una violación de ley. El Ministerio Público aduce que el tribunal de instancia suprimió evi-

dencia ocupada válidamente por la Policía de Puerto Rico durante un "bloqueo en que se intervino indiscriminadamente con todos los vehículos que transcurrieron por éste". Confirmamos.

I

En la mañana del viernes 16 de abril de 1993, entre cincuenta (50) y sesenta (60) agentes de la Policía de Puerto Rico acudieron al residencial público Virgilio Dávila de Bayamón para diligenciar varias órdenes de arresto. Como parte de este operativo, la Policía bloqueó las tres (3) carreteras públicas que permitían el acceso al residencial con el objetivo de revisar las licencias de conducir y de registro de todos los vehículos que intentaran entrar o salir de éste.

Alrededor de las 9:00 de la mañana de ese día, al intentar salir en su automóvil marca Saab, modelo de 1983, del residencial en donde vivía, el acusado Henry Yip Berríos fue detenido por el Agente Héctor Ruiz García, quien estaba asignado a una de las vías bloqueadas por la Policía. Según surge de la transcripción de la vista de supresión de evidencia, al detener el vehículo, Ruiz García le ordenó a Yip Berríos que le mostrara su licencia de conducir y la licencia de registro del auto.

La detención y solicitud de los documentos de Yip Berríos ocurrieron sin que el policía Ruiz García tuviera conocimiento o sospecha alguna de que él hubiera cometido o estuviera en vías de cometer algún delito. En particular, no tenía conocimiento o sospecha de que Yip Berríos hubiese incurrido en alguna falta bajo la Ley Núm. 141 de 20 de julio de 1960 (9 L.P.R.A. sec. 301 *et seq.*, según enmendada) conocida como Ley de Vehículos y Tránsito de Puerto Rico. Más aún, del expediente ante nos tampoco surge que alguna de las órdenes de arresto que estaban siendo diligenciadas en el residencial estuviera dirigida contra Yip

Berríos. En este contexto, la detención de Yip Berríos fue realizada tan sólo en cumplimiento de la orden que los supervisores de la Policía brindaron para que se detuviera a todo vehículo que entrara o saliera del residencial.

Yip Berríos entregó los documentos solicitados según le fue requerido. Al examinarlos, el agente Ruiz García se percató de que el número de tablilla que indicaba la licencia de registro del auto (50-B-92) no coincidía con el que llevaba el vehículo (AWM-422). Ante esto el policía le ordenó que bajara del auto.(¹) Luego de ello, Ruiz García examinó el interior del vehículo y observó un arma de fuego entre los dos (2) asientos delanteros. Al ser cuestionado sobre ella, Yip Berríos aceptó que no poseía licencia para portar armas. Fue entonces cuando Ruiz García lo puso bajo arresto, le hizo las advertencias de rigor y procedió a registrarlo. Como producto de este registro, la Policía encontró dos (2) envolturas de aluminio en los bolsillos del pantalón que contenían lo que resultó ser heroína. Tanto la heroína como el arma encontrada en el auto fueron incautadas por la Policía.

Por estos hechos, el Ministerio Público acusó a Yip Berríos por violación al Art. 404(a) de la Ley de Sustancias Controladas de Puerto Rico, 24 L.P.R.A. sec. 2404; a la Sec. 2-801(7) de la Ley de Vehículos y Tránsito de Puerto Rico, 9 L.P.R.A. sec. 591(7), y a los Arts. 6, 8 y 11 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. secs. 416, 418 y 421.

---

(¹) En su escrito de petición de *certiorari*, el Ministerio Público dirige nuestra atención hacia una contradicción entre lo expresado por el Magistrado de instancia en la vista de supresión de evidencia y lo que finalmente señaló en la resolución recurrida. Dicha discrepancia gira en torno a si la orden que le dio el oficial de policía a Yip Berríos para que bajara del auto fue anterior o posterior a la determinación de la incongruencia en el número de la tablilla del auto. Hemos observado que en el expediente ante nos hay expresiones del agente Ruiz García que tienden a indicar que la orden de bajar del auto ocurrió *antes* de que se percatara de la anomalía con el número de la tablilla. Véase Petición de *certiorari*, Apéndice IV. Sin embargo, aunque tal incongruencia existe, ésta no dispone de la controversia que plantea el caso, pues, aún asumiendo la posición más ventajosa para el Estado, esto es, que la solicitud de bajar del auto ocurrió luego de que el agente se percatara de la anomalía, llegamos a la misma conclusión a la luz de la totalidad de las circunstancias presentes en la operación del bloqueo. Véanse: Transcripción de la vista de supresión de evidencia, pág. 3; Petición de *certiorari*, Apéndice IV, pág. 31.

Oportunamente, el imputado solicitó la supresión de la evidencia y alegó que la detención en el residencial fue ilegal, ya que fue efectuada sin que existieran motivos fundados o causa probable para creer que hubiera cometido delito alguno. Por ello, adujo que la evidencia obtenida en tales circunstancias debía ser suprimida.

El Tribunal Superior, Sala de Bayamón (Hon. Ramón E. Gómez Colón, Juez), acogió los planteamientos del imputado y suprimió la evidencia incautada en el bloqueo. Dicho foro concluyó que en ausencia de sospecha individualizada, la detención del imputado Yip Berríos violentó nuestro ordenamiento constitucional, por lo que la evidencia obtenida a raíz de dicha intervención debía ser suprimida. De igual forma declaró inconstitucional la Sec. 5-1120(a) de la Ley de Vehículos y Tránsito de Puerto Rico, 9 L.P.R.A. sec. 1152, que obliga a los conductores a detenerse y mostrar los documentos necesarios cuando un agente del orden público así lo requiera.

Ante este cuadro, el Estado acudió ante nos mediante un recurso de *certiorari* en el que le imputa al tribunal de instancia la comisión de los cuatro (4) errores siguientes:

1. Si erró el Tribunal Superior al declarar inconstitucional la Sección 5–1120(A) de la Ley de Vehículos y Tránsito y al no aplicar, aun en tal caso, la doctrina del registro de buena fe.
2. Si erró el Tribunal Superior al no aplicar la norma que permite el "bloqueo" de vehículos para cotejar licencias de conducir y del vehículo.
3. Si fue correcta la interpretación que el Tribunal Superior hizo del caso de *Delaware v. Prouse*, 440 U.S. 648 (1979).
4. Si fue correcta la determinación del Tribunal Superior de que procedía suprimir la evidencia por razón de que su obtención fue fruto de un operativo ilegal.

Oportunamente expedimos el recurso.[2] El primer error señalado requiere pasar juicio sobre la validez constitucio-

---

[2] Mediante Resolución de 7 de diciembre de 1993 paralizamos los procedimientos en el foro de instancia y solicitamos que se presentaran los autos originales del caso. En esa ocasión, el Juez Asociado Señor Rebollo López hizo constar que tenía "reservas sobre la validez de la detención del vehículo del recurrido".

nal de la Sec. 5-1120(a) de la Ley de Vehículos y Tránsito de Puerto Rico, *supra*. Los últimos tres (3) errores, por su parte, cuestionan la capacidad constitucional del Estado para realizar bloqueos en las carreteras públicas del país y detener vehículos de motor, sin que exista sospecha individualizada o motivos fundados para creer que su conductor u ocupantes cometieron o estaban cometiendo algún delito o alguna violación a las leyes de tránsito. Su resolución, en consecuencia, requiere considerar el alcance de la protección constitucional contra registros, allanamientos e incautaciones irrazonables que provee la Sec. 10 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1, y la Cuarta Enmienda federal, L.P.R.A., Tomo 1, en el contexto específico que plantea el caso ante nos.

Las partes han comparecido. Luego de estudiar sus respectivos escritos consideramos apropiado discutir en primer lugar los últimos tres (3) errores apuntados. Posteriormente, consideraremos la determinación de inconstitucionalidad que hiciera el Magistrado de instancia. Así, pues, con el beneficio de la comparecencia de las partes, y luego de estudiar el derecho aplicable, resolvemos.

## II

La Sec. 10 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, *supra*, ed. 1982, pág. 299, en lo aquí pertinente, dispone:

> No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.
>
> . . . . . . . .
>
> Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse.

Evidencia obtenida en violación de esta sección será inadmisible en los tribunales.

Esta disposición es análoga a la Cuarta Enmienda de la Constitución de Estados Unidos, *supra*, 3 Diario de Sesiones de la Convención Constituyente 1568 (1952); J. Trías Monge, *Historia Constitucional de Puerto Rico* San Juan, Ed. U.P.R., 1982, Vol. III, pág. 191, y, al igual que su equivalente federal, su objetivo básico es proteger el ámbito de intimidad y dignidad del individuo frente a actuaciones arbitrarias del Estado. *Pueblo v. Santiago Alicea I*, 138 D.P.R. 230 (1995); *Pueblo en interés menor N.R.O.*, 136 D.P.R. 949 (1994), *Pueblo v. Martínez Torres*, 120 D.P.R. 496, 500 (1988); en cuanto a la jurisdicción federal, véanse: *United States v. Mendenhall*, 446 U.S. 544 (1980); *Katz v. United States*, 389 U.S. 347, 350 (1967). En términos prácticos, dicha disposición constitucional pretende impedir que el Estado interfiera con la intimidad y libertad de las personas excepto en aquellas instancias en las que el propio ordenamiento lo permite. Véanse: E.L. Chiesa, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1991, Vol. 1, pág. 283; O.E. Resumil de Sanfilippo, *Derecho Procesal Penal*, Orford, Equity Publishing Co., 1990, T. 1, pág. 203 *et seq.*

Aunque la garantía constitucional conferida a los individuos en la Sec. 10 del Art. II de nuestra Constitución, *supra*, es análoga a la federal, en el pasado hemos señalado que su contenido es distinto. *Pueblo v. Dolce*, 105 D.P.R. 422, 429 (1976). En esa ocasión expresamos que "[a]mbas disposiciones respondieron a circunstancias diferentes y es natural que su interpretación se atenga, dentro del marco de nuestras relaciones con Estados Unidos, a las realidades cambiantes de una y otra sociedad". Íd.

En este contexto, hemos señalado que la citada Cuarta Enmienda federal "describe el ámbito mínimo de la garantía que reconoce". pág. 427. Esto significa que los es-

tados y Puerto Rico, aunque no pueden reducir el ámbito de protección reconocido por la jurisprudencia interpretativa de la Cuarta Enmienda federal, *supra*, pueden ampliarlo con el objetivo de conceder una mayor protección a la ciudadanía. *Sibron v. New York*, 392 U.S. 40, 60–61 (1968); *Cooper v. California*, 386 U.S. 58, 62 (1967). De hecho, nuestra Constitución contiene dos (2) disposiciones adicionales al Art. II, Sec. 10, *supra*, que le imprimen mayor vitalidad a la protección constitucional a la intimidad. Estas son la Sec. 1 de nuestra Carta de Derechos, L.P.R.A., Tomo 1, ed. 1982, pág. 257, preceptiva de que "[l]a dignidad del ser humano es inviolable", y la Sec. 8 del Art. II, L.P.R.A., Tomo 1, ed. 1982, pág. 292, que establece el derecho de toda persona "a protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar". Esta mayor especificidad y extensión de nuestro texto constitucional nos ha llevado a afirmar que con relación a la protección del derecho a la intimidad nuestra Constitución es de "factura más ancha que la tradicional". *E.L.A. v. Hermandad de Empleados*, 104 D.P.R. 436, 440 (1975). Véase, además, *López Vives v. Policía de P.R.*, 118 D.P.R. 219 (1987).

Como es sabido, la determinación de si existe protección al amparo de la Cuarta Enmienda o según su equivalente en Puerto Rico requiere determinar si quien reclama la protección constitucional tiene derecho a abrigar una razonable expectativa a la intimidad ante la actuación gubernamental impugnada, ya sea un registro, un allanamiento o una incautación. *Katz v. United States*, supra, pág. 361; *California v. Greenwood*, 486 U.S. 35 (1988). De este modo hemos advertido que nuestra protección constitucional requiere determinar "si la persona tiene un derecho razonable a abrigar, donde sea, dentro de las circunstancias del caso específico, la expectativa de que su intimidad se respete". *Pueblo v. Lebrón*, 108 D.P.R. 324,

331 (1979); *E.L.A. v. P.R. Tel. Co.*, 114 D.P.R. 394, 402 (1983).

En relación con la citada Sección 10 del Artículo II de nuestra Constitución, el criterio que determina si la actuación gubernamental es constitucionalmente permisible es el de la razonabilidad de la intrusión estatal con la intimidad de la persona. Esto normalmente se determina balanceando los intereses del Estado frente a los derechos individuales. El menor o mayor grado de expectativa a la intimidad que nuestro ordenamiento le reconoce a una persona en determinada circunstancia es pertinente para el análisis acerca de la razonabilidad de la actuación gubernamental y en consecuencia para determinar el alcance de la protección constitucional. En este contexto, y dado que en Puerto Rico los derechos individuales y particularmente el derecho a la intimidad y dignidad reciben una protección más amplia que en la jurisdicción federal, en nuestra jurisdicción el criterio de razonabilidad es más estricto.

### III

En *Pueblo v. Sosa Díaz*, 90 D.P.R. 622 (1964), extendimos la protección constitucional que ofrece la sección 10 del Art. II de nuestra Constitución, *supra*, específicamente a los vehículos de motor. Sin embargo, hemos advertido que el alcance de la protección de las personas en circunstancias que involucran automóviles es menor. Véanse: *Pueblo v. Malavé González*, 120 D.P.R. 470, 478 (1988); *Pueblo v. Acevedo Escobar*, 112 D.P.R. 770, 775 (1982). Esto no significa que al viajar en un automóvil renunciamos a nuestro derecho a la intimidad y a no autoincriminarnos. *Pueblo v. Malavé González*, supra, págs. 478–479. Lo que ocurre es que por las diferencias conceptuales y funcionales existentes entre un vehículo y una residencia, así como por el hecho de que el tránsito por las vías públicas es una materia muy reglamentada, hemos reconocido como razo-

nable un grado de intrusión gubernamental mayor con el ámbito de intimidad individual en tales circunstancias que la que de ordinario se reconoce en una residencia. *Pueblo v. Malavé González*, supra, pág. 478; *Pueblo v. Acevedo Escobar*, supra, pág. 776. No obstante, en uno u otro caso la validez de la intervención gubernamental queda condicionada a que dentro de las circunstancias del caso tal intervención sea razonable.

■ Tanto bajo la Cuarta Enmienda federal como bajo la Constitución de Puerto Rico, la detención temporera de una persona que conduce un vehículo de motor por parte de agentes estatales constituye una incautación de la persona, aún cuando la detención haya sido por un período breve de tiempo o para un propósito en específico. *Whren v. United States*, 517 U.S. 806 (1996); *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). Tal es la situación que ocurre cuando un agente estatal detiene un vehículo en un bloqueo de carretera.([3]) De este modo, la detención de un vehículo por parte de un miembro de la Policía queda enmarcada dentro del imperativo constitucional de que dentro de las circunstancias del caso, tal incautación sea razonable, de forma que no se lesionen los derechos de la ciudadanía. *Whren v. United States*, supra, pág. 1772.

■ En el pasado hemos reconocido como razonable la detención de un vehículo de motor bajo circunstancias que originan motivos fundados o causa probable para creer que ha ocurrido una violación de las leyes de tránsito.([4]) *Pueblo v. Malavé González*, supra; *Pueblo v. De*

---

([3]) Advertimos, sin embargo, que pueden haber instancias en las que la realización de un bloqueo de carreteras no implique necesariamente la existencia de una incautación de la persona. Éste podría ser el caso de un bloqueo en el que tan sólo se obliga al conductor a reducir la velocidad del automóvil al atravesar por éste.

([4]) Los conceptos *causa probable* y *motivos fundados* son sinónimos. En el pasado los hemos definido como "aquella *información y conocimiento* que lleven a una persona ordinaria y prudente a creer que el arrestado ha cometido un delito, independientemente de que luego se establezca o no la comisión del delito". (Énfasis en el original.) *Pueblo v. Martínez Torres*, 120 D.P.R. 496, 504 (1988). Véase, además, *Pueblo v. González Rivera*, 100 D.P.R. 651, 654–655 (1972).

*Jesús Robles*, 92 D.P.R. 345 (1965); de la jurisdicción federal, véanse: *Whren v. United States*, supra; *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977); *Dunaway v. New York*, 442 U.S. 200, 209 (1979). En esa ocasión señalamos que era válida la detención de un vehículo de motor cuando su conductor ha cometido una infracción de tránsito. Al así actuar, indicamos que dicha detención constituye "una detención con propósitos específicos y por un período de tiempo limitado". *Pueblo v. Malavé González*, supra, pág. 481. Sin embargo, en cuanto a un grado de intervención mayor, como lo sería el registro del interior del vehículo, expresamos que en ausencia de circunstancias especiales es necesario obtener una orden judicial para que tal actuación pueda ser constitucionalmente válida. Íd.

Más tarde, en *Pueblo v. Martínez Torres*, supra, reconocimos como válida la detención de un vehículo de motor y el arresto de su conductor por parte de un agente de la Policía que actúe a base de información colectiva cuando el agente que inicia la cadena de comunicaciones tenga motivos fundados para creer que la persona arrestada ha incurrido en una violación de ley.

De igual forma hemos validado la prerrogativa de la Policía de detener a un ciudadano con propósitos investigativos, como parte de la obligación de dicho cuerpo de patrullar las vías públicas y de investigar la actividad delictiva, siempre que la persona detenida consienta a la intervención. *Pueblo en interés menor N.R.O.*, supra; *Pueblo v. Acevedo Escobar*, supra, pág. 778.

La controversia que hoy está ante nuestra consideración es distinta. La detención del vehículo en que viajaba Yip Berríos ocurrió sin que la Policía tuviera motivos fundados para creer que éste hubiese infringido alguna disposición de ley. Tampoco tenía el consentimiento del detenido. Ante esto, debemos decidir si una detención en un bloqueo de carreteras, efectuada sin que exista algún grado de sospe-

cha individualizada, es permisible bajo nuestro ordenamiento constitucional.

■ En Puerto Rico nunca antes habíamos tenido la oportunidad de examinar semejante controversia. En Estados Unidos, por el contrario, ésta ha generado considerables debates, siendo el Tribunal Supremo de ese país el exponente principal de los principios fundamentales que amparan la protección constitucional contra registros y allanamientos irrazonables al amparo de la citada Cuarta Enmienda en ese contexto. Por lo tanto, al resolver el caso de autos acudimos a esa jurisdicción para evaluar el tratamiento que se le ha brindado a la garantía constitucional en tales circunstancias, de modo que podamos precisar el ámbito mínimo de la protección constitucional que los estados y Puerto Rico están obligados a conceder a la ciudadanía. Oportunamente, trazaremos los contornos de la protección constitucional bajo nuestra Constitución. La referencia a casos de otras jurisdicciones es, en este sentido, ilustrativa. En cuanto a la jurisprudencia federal, su uso es únicamente a los fines de precisar el contenido mínimo de la Sec. 10 de la Carta de Derechos de nuestra Constitución, *supra*.

IV

El Tribunal Supremo federal consideró la validez constitucional de la detención de un vehículo de motor en un bloqueo de carreteras por vez primera en *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976).[5] Allí, en varios ca-

---

[5] La jurisprudencia previa del Tribunal Supremo de Estados Unidos había considerado tan sólo la validez constitucional de registros efectuados en bloqueos de carreteras o de detenciones efectuadas por agentes estatales mientras realizaban un patrullaje preventivo en circunstancias en las que los agentes carecían de alguna sospecha individualizada de que los ocupantes de los vehículos hubieran cometido alguna violación de ley. Al respecto, véanse: *Carroll v. United States*, 267 U.S. 132 (1925), (en el cual se determinó que la detención y el registro de un vehículo podía ser hecha sin orden judicial previa tan sólo en aquellos casos en que la detención era

sos consolidados se cuestionaba la validez, bajo la Cuarta Enmienda, de las detenciones efectuadas por la Policía de Frontera en dos (2) bloqueos de carreteras localizados de forma permanente en las cercanías de la frontera estadounidense con Méjico, como medida para controlar la entrada de indocumentados.([6])

Al sostener la validez constitucional de las detenciones impugnadas, el Tribunal Supremo federal expresó que la Constitución de Estados Unidos permitía la realización de lo que denominó *reasonably located checkpoints*, en los cuales los vehículos podían ser detenidos en ausencia de algún grado de sospecha individualizada. *United States v. Martinez-Fuerte*, supra, pág. 562. Para llegar a esta conclusión, dicho foro examinó la razonabilidad de la intervención a la luz del balance de los intereses involucrados. Por un lado, consideró la magnitud del interés público que motivaba la intervención y la eficacia del mecanismo utilizado para adelantar dicho interés. De otro lado, el tribunal consideró el alcance de la intrusión gubernamental con la intimidad individual.

Al respecto, el Tribunal Supremo de Estados Unidos señaló que el interés gubernamental en el control del tráfico de inmigrantes era muy alto, mientras que la intrusión en

---

efectuada basándose en *causa probable* para creer que los autos detenidos contenían bebidas alcohólicas ilegales); *Almeida-Sanchez v. United States*, 413 U.S. 266 (1973), (en el que se rechazó la contención gubernamental de que el interés nacional de controlar la inmigración fuese justificación suficiente para eximir del requisito de causa probable u orden judicial previa a los agentes patrulleros estatales para que éstos pudieran registrar válidamente un vehículo de motor); *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975), (en el cual se declaró inconstitucional la detención de un vehículo de motor por miembros de la Patrulla de Frontera durante un patrullaje preventivo por la única razón de que sus ocupantes parecían de ascendencia mejicana); *United States v. Ortiz*, 422 U.S. 891 (1975), (en el que se determinó que, bajo las exigencias de la Cuarta Enmienda federal, la Policía no puede registrar un vehículo de motor en ausencia de causa probable o el consentimiento del conductor).

([6]) En uno de los bloqueos impugnados, todos los vehículos fueron detenidos. En el otro, los vehículos reducían su marcha al atravesar por el bloqueo mientras un oficial los observaba. Si este oficial, a su vez, concluía que algún vehículo parecía sospechoso, lo dirigía a un área secundaria de inspección en donde se les preguntaba a sus ocupantes sobre su ciudadanía y, si era el caso, sobre su estatus como inmigrantes.

la intimidad individual resultante era mínima, pues ni los ocupantes de los vehículos ni los vehículos mismos eran registrados. *United States v. Martinez-Fuerte*, supra, pág. 558. Además, dicho foro sostuvo que la discreción ejercida por los agentes estatales, así como el potencial de que los bloqueos interfirieran con las personas que transitaban de forma legítima, eran mínimos.[7]

En *United States v. Martinez-Fuerte*, supra, se elaboró una distinción importante en cuanto al tipo de intrusión con la intimidad de la que puede ser objeto una persona, lo que contribuyó a la determinación de la constitucionalidad de los bloqueos allí impugnados. Por un lado, se encuentra lo que el Tribunal federal denominó *intrusión objetiva*, constituida por la detención en sí misma, la inspección visual y cualquier tipo de intercambio verbal entre el detenido y los agentes estatales. Por otro lado, se encuentra la *intrusión subjetiva*, caracterizada por el sentimiento de aprehensión, temor o aun de sorpresa que ocasiona la detención en quienes transitan por las vías públicas. Según el Tribunal Supremo de Estados Unidos, este último tipo de intrusión o interferencia con la intimidad individual es sustancialmente menor en el caso de los bloqueos que la que de ordinario ocurre cuando una persona es detenida por un policía que realiza un patrullaje preventivo. Sobre este particular, el Tribunal federal explicó:

En los bloqueos de tráfico un conductor puede ver que otros

_____

(7) Al respecto, el Tribunal Supremo federal expresó:
"... La localización de un bloqueo permanente no es escogida por oficiales en el campo, sino por oficiales responsables de tomar decisiones generales, en cuanto a la utilización más efectiva de los recursos limitados. Podemos asumir que tales oficiales estarán menos dispuestos a establecer un bloqueo de carreteras en un lugar en donde se afecte de forma arbitraria u opresiva a los conductores como clase. Además, en la medida en que los oficiales tan solo pueden detener a aquellos vehículos que pasen por el bloqueo, existe menos margen para detenciones de individuos de forma abusiva u hostigante que el que existía en las detenciones efectuadas en patrullajes preventivos. (Traducción nuestra.) *United States v. Martinez-Fuerte*, 428 U.S. 543, 559 (1976).

vehículos están siendo detenidos; puede ver los signos visibles de la autoridad del oficial y está menos suceptible de ser atemorizado o molestado por la intrusión. (Traducción nuestra.) *United States v. Martinez-Fuerte,* supra, pág. 558, citando con aprobación a *United States v. Ortiz,* 422 U.S. 891, 894–895, (1975).

En el balance de intereses, el Tribunal Supremo federal estimó que dado el interés público involucrado y el alcance de la intrusión con la intimidad de las personas, la intervención gubernamental resultaba razonable, por lo que el bloqueo resistía el escrutinio constitucional.

Tres (3) años más tarde el Tribunal Supremo de Estados Unidos resolvió *Delaware v. Prouse,* 440 U.S. 648 (1979). En éste, un oficial de la Policía que hacía una ronda por el condado de New Castle en Delaware detuvo un vehículo de motor en cuyo interior ocupó marihuana. Según el testimonio brindado por el patrullero, la detención la efectuó de forma rutinaria, sin que tuviera motivos fundados o sospecha razonable para creer que la persona detenida hubiera cometido delito alguno. Tampoco había percibido alguna violación a las leyes tránsito. El agente de la Policía tan sólo realizó la detención con el único objetivo de revisar las licencias de conductor y de registro del vehículo. Nótese que distinto a *United States v. Martinez-Fuerte,* supra, la detención en *Prouse* no fue efectuada como parte de un bloqueo de carreteras, sino como parte de un patrullaje preventivo.

Al evaluar la razonabilidad de la intrusión con la intimidad individual, el Tribunal Supremo de Estados Unidos rechazó la contención de que el interés gubernamental en identificar conductores no autorizados, así como el interés de velar porque las normas de seguridad en la conducción de un vehículo de motor fuesen satisfechas, constituyeran razones suficientes para validar un sistema en el que el agente estatal tuviera discreción absoluta para detener conductores. *Por ello concluyó que detener un vehículo y solicitar la licencia de conducir y la del registro del*

*auto, en ausencia de algún grado de sospecha individualizada sobre la comisión de algún delito por parte de sus ocupantes, era impermisible según la Cuarta Enmienda. Bajo el mínimo federal exigido por la Constitución de Estados Unidos, a la Policía le está vedado detener un vehículo durante un patrullaje preventivo sin que exista sospecha individualizada que lo justifique.*

██ A pesar de lo anterior, el Tribunal Supremo federal *implícitamente aceptó que la realización de un bloqueo para revisar licencias podría ser constitucionalmente válida si se utilizaban métodos menos intrusivos en la intimidad individual o métodos que no involucraran un ejercicio de discreción y arbitrariedad irrestricta por parte de los oficiales estatales.* Por esto añadió que "[d]etener y hacerle preguntas a todos los vehículos que transiten por un bloqueo de carreteras es una posible alternativa" para suprimir esa arbitrariedad. *Delaware v. Prouse*, supra, pág. 674.

La validez de un bloqueo de carreteras se puso a prueba nuevamente en *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444 (1990). Allí, el Tribunal Supremo federal pasó juicio sobre la validez de un programa estatal de control de alcohol que operaba mediante el establecimiento de bloqueos o puntos de examen de conductores en las carreteras. El bloqueo impugnado en *Sitz* era realizado siguiendo unas guías preestablecidas en cuya preparación habían participado no sólo la Policía de Michigan, sino también miembros de la Fiscalía del estado y el *University of Michigan Transportation Research Institute.*

██ Siguiendo los precedentes de *United States v. Martinez-Fuerte*, supra, y *Delaware v. Prouse*, supra, el Tribunal Supremo de Estados Unidos estimó que el grado de intrusión con la intimidad individual, tanto en su vertiente objetiva como en su vertiente subjetiva, era mínimo, por lo que al ser sopesado con el interés gubernamental involucrado —reducir accidentes causados por personas en estado de embriaguez— y con su efectividad en el logro de

ese objetivo, la decisión debía recaer a favor del programa gubernamental. *Asimismo, el Tribunal federal señaló que los bloqueos de control del alcohol en el caso de Michigan Dept. of State Police v. Sitz,* supra, *no otorgaban la discreción irrestricta a los oficiales estatales que fue condenada en Prouse. Por ello, el Tribunal validó la detención inicial de los conductores en los bloqueos de carreteras bajo su consideración, como intento para reducir los accidentes causados por conductores ebrios.*

Múltiples jurisdicciones estatales, a su vez, han considerado la controversia que nos ocupa llegando a resultados diversos, los cuales han estado matizados por las exigencias de sus respectivas constituciones estatales.([8]) En este contexto, algunos tribunales han validado los bloqueos que tan sólo obligan al conductor a reducir la velocidad al acercarse a ellos y le dejan la opción de iniciar una conversación con el policía o continuar su marcha. *State v. Talbot,*

---

([8]) Para casos de otras jurisdicciones en donde se validó el uso de bloqueos establecidos de forma sistemática, véanse: *Merrett v. Moore,* 58 F.3d 1547 (11mo Cir. 1995); *State v. Bates,* 902 P.2d 1060 (N.M. 1995); *State v. Loyd,* 530 N.W.2d 708 (1995); *Hooten v. State,* 442 S.E.2d 836 (1994); *People v. Wells,* 608 N.E.2d 578 (1993); *U.S. v. Corral,* 823 F.2d 1389 (10mo Cir. 1987), *cert.* denegado, 486 U.S. 1054 (1988); *United States v. Miller,* 608 F.2d 1089 (5to Cir. 1979) *cert.* denegado, 447 U.S. 926 (1980); *Smith v. State,* 515 So. 2d 149, 152 (1987); *Miller v. State,* 373 So. 2d 1004 (1979); *State v. Cloukey,* 486 A.2d 143 (1985).

Para algunos casos en los que el bloqueo impugnado fue declarado inconstitucional, véanse: *Hagood v. Town of Town Creek,* 628 So. 2d 1057 (1993), (en el que el Tribunal declaró inconstitucional el bloqueo impugnado por haber sido ubicado frente a un edificio de apartamentos con objetivos diversos, sin seguir normas escritas preconcebidas y sin que existieran medidas de seguridad adecuadas, por lo que a juicio del Tribunal, el Estado no satisfizo el peso de la prueba de demostrar la razonabilidad de su actuación); *People v. Evans,* 579 N.Y.S.2d 853 (1992), (en el cual el Tribunal declaró inválido un bloqueo de carreteras efectuado en un área de alta incidencia de prostitución con el único propósito de combatir este problema); *State v. Sims,* 808 P.2d 141 (Utah 1991), (entre los factores que contribuyeron a la determinación de inconstitucionalidad estaban: la inexistencia de un plan explícito en la conducción del bloqueo; las ausencias de oficiales supervisores que participaron en la conducción del bloqueo, e indicadores que evidenciaran que la autorización de la realización del bloqueo estuviera fundamentada en un análisis previo del interés público protegido por la estrategia, su efectividad y el grado de intrusión en la intimidad individual); *Galberth v. U.S.,* 590 A.2d 990 (1991), (en el que se determinó que el interés general en controlar el crimen no era razón suficiente para justificar el bloqueo impugnado, más aún cuando no había evidencia empírica que apoyara la contención gubernamental de que el bloqueo era un mecanismo adecuado para reducir los delitos vinculados a las drogas).

792 P.2d 489 (Utah 1990); *Little v. State,* 479 A.2d 903 (1984). Otros han permitido al conductor que se aproxima a un bloqueo tomar una vía alterna y evadir el contacto con éste. *State v. Talbot,* supra; *Ingresoll v. Palmer,* 743 P.2d 1299 (1987); *State v. Super. Ct. in & for County of Pima,* 69 P.2d 1073 (Ariz. 1984). Aún otros han requerido que el Estado obtenga una autorización judicial previa para poder establecer el bloqueo. *State v. Olgaard,* 248 N.W.2d 392 (1976).

 Algunos tribunales estatales han sido más precisos y han identificado una serie de requisitos o factores que deben ser considerados al momento de evaluar la validez constitucional de un bloqueo de carreteras.[9] No obstante, la vasta jurisprudencia existente que valida la práctica gubernamental de realizar bloqueos de carreteras ha sido consecuente al utilizar como metodología de análisis el escrutinio desarrollado por la jurisprudencia federal. De este modo, la razonabilidad de la actuación gubernamental ha estado sujeta al resultado del balance de los tres (3) factores siguientes: (*a*) la magnitud del interés público servido por la incautación; (*b*) el grado con que dicha incautación adelanta el interés público, y (*c*) el grado de interferencia con la intimidad y libertad individual. Estos factores, a su vez, han estado matizados por las diversas exigencias constitucionales de los estados en cuanto al grado de protección que le confieren al ámbito de intimidad individual. El re-

---

[9] Un caso particularmente ilustrativo lo es *State v. Deskins,* 673 P.2d 1174 (Kan. 1983), en el que el Tribunal Supremo de Kansas esbozó los factores siguientes para evaluar la validez de los bloqueos de carreteras: (1) el grado de discreción, si alguna, dejado al oficial de la Policía; (2) la localización del bloqueo; (3) la hora en que el bloqueo es efectuado y su duración; (4) los estándares establecidos por oficiales superiores; (5) si hubo notificación previa al público en general; (6) si existían avisos o advertencias previas para los conductores que se acercan al lugar del bloqueo; (7) el mantenimiento de condiciones de seguridad; (8) el grado de temor y la ansiedad que genera el modo de operación; (9) la duración promedio de la detención de las personas; (10) los factores físicos involucrados en la localización, tipo y modo de operación; (11) la existencia de métodos menos intrusivos para combatir el problema; (12) el grado de efectividad del procedimiento, y (13) cualquier circunstancia adicional relevante que pueda contribuir en el escrutinio.

sultado de este análisis determina la validez constitucional del bloqueo en cuestión.

La evaluación del bloqueo de carreteras bajo nuestra consideración, a la luz de estos criterios, requiere determinar previamente si la incautación que de ordinario supone una detención en un bloqueo es permisible bajo nuestro esquema constitucional. Si este análisis revela que tal detención resulta permisible, debemos entonces evaluar la constitucionalidad del bloqueo en específico que está bajo nuestra consideración.

## V

El criterio que permea la Sec. 10 del Art. II de nuestra Constitución, *supra*, y que delimita el grado de intrusión estatal permisible en el ámbito de intimidad individual es el de razonabilidad. Como parte integral de esta evaluación se levanta la expectativa a la intimidad albergada por una persona en determinado contexto. Reconocida la existencia de una expectativa legítima a la intimidad, cualquier actuación gubernamental que pretenda interferir con ese ámbito debe ser razonable de acuerdo con las circunstancias específicas del caso. Cuanto mayor sea la expectativa legítima a la intimidad, mayor será el alcance de la protección constitucional. Mientras menor sea la expectativa legítima a la intimidad, menor será el alcance de la protección constitucional y, por lo tanto, el grado de interferencia estatal jurídicamente permisible en ese ámbito será mayor. En ambos casos, "[e]l análisis del alcance de la protección constitucional se hará de acuerdo con la aplicación de la doctrina del balance de intereses". Resumil de Sanfilippo, *op. cit.*, pág. 205.

Al examinar la naturaleza de la detención de un vehículo en un bloqueo de carreteras debemos destacar que el Estado regula, controla y limita el uso de las vías públicas en múltiples formas con el fin de mantener y promover

la seguridad de las personas que a diario transitan por ellas. 37 A.L.R.4th 10 (1985); 7A A.Jur.2d sec. 101. Con este propósito se le exige a los conductores que tengan una licencia de conducir y que los vehículos de motor estén inscritos en el Departamento de Transportación y Obras Públicas de Puerto Rico. Véase la Ley de Vehículos y Tránsito de Puerto Rico, según enmendada, *supra*. Quien quiera conducir un vehículo de motor de forma legal tiene que cumplir con las exigencias estatutarias y reglamentarias que nuestro ordenamiento prescribe para ello.

Al hacer uso de las carreteras, las personas saben que la Policía fiscaliza continuamente las vías públicas. La constante actividad policiaca en las carreteras del país es incluso percibida por la población con normalidad. Esta situación diluye en alguna medida la expectativa a la intimidad que razonablemente puede albergar una persona cuando conduce un vehículo de motor y ejemplifica el hecho de que la sociedad reconoce como válido cierto grado de intervención con el ámbito de la intimidad individual cuando se conduce un vehículo de motor en las vías públicas.

Por otro lado, la individualización que existe en el caso de una detención en un patrullaje preventivo o en un arresto es casi inexistente en el caso de una detención de un vehículo de motor en un bloqueo de carreteras. Notamos que todos los que transitan por un bloqueo de carreteras están expuestos a ser detenidos por los agentes estatales. A los ojos del público, la intrusión estatal en ese contexto es menos ofensiva y, por ende, el efecto en la reputación del detenido es menor o casi inexistente.[10] La intrusión estatal adquiere así otro matiz, otro alcance. Se trata de una intrusión estatal que en determinadas circunstancias podría resultar sustancialmente menor a la

---

[10] Por una razón similar, en *E.L.A. v. Coca Cola Bott. Co.*, 115 D.P.R. 197 (1984), adoptamos un estándar menos riguroso que en el ámbito criminal para determinar causa probable en los casos de registros administrativos.

que nuestro ordenamiento condena en ausencia de causa probable.

A la luz de lo anterior, requerir causa probable para realizar la detención de un vehículo en un bloqueo podría constituir una carga onerosa para el interés público que en determinada circunstancia haya motivado su realización. *En consecuencia, resolvemos que la validez de un bloqueo de carreteras en nuestra jurisdicción queda sujeta a un análisis de su razonabilidad. Dicho análisis debe partir de los criterios que la jurisprudencia federal y estatal han reconocido como pertinentes, y que adoptamos. Estos son: (1) la magnitud del interés público que motiva la realización del bloqueo; (2) el grado con que éste adelante dicho interés, y (3) el alcance de la intrusión con la intimidad. Cada bloqueo debe ser evaluado de forma individual para determinar si se ajusta a las exigencias constitucionales de nuestro ordenamiento y si, en el balance de intereses, resulta razonable un menor alcance de la protección constitucional ante el interés público involucrado.*

Como parte de este análisis debe examinarse el objetivo principal que motiva la realización del bloqueo para determinar si éste es suficiente para justificar el grado de intrusión a la intimidad individual que supone la detención de un vehículo de motor. En este extremo, coincidimos con lo resuelto en casi todas las jurisdicciones de Estados Unidos en cuanto a que la realización de un bloqueo de carreteras con el objetivo de encontrar a cualquiera que haya cometido un delito no es justificación para la validación de la detención. Véanse: *U.S. v. McFayden*, 865 F.2d 1306 (Cir. D.C. 1989); *Galberth v. U.S.*, supra. Por ello, como norma general, la utilización de bloqueos de carreteras con propósitos generales (*general enforcement purposes*) es ilegal.

De igual modo, el Estado no puede postular la existencia de un objetivo legítimo como pretexto para adelantar objetivos que no satisfacen el escrutinio constitucional. Al

respecto, deben examinarse aspectos como la localización del bloqueo, la hora y las prácticas de los agentes estatales durante su operación para determinar si su *propósito principal* es ajeno al objetivo postulado. Véanse: *U.S. v. McFayden*, supra; *U.S. v. Morales-Zamora*, 974 F.2d 149 (10mo Cir. 1992). Asimismo, es necesario evaluar la efectividad del bloqueo en adelantar el interés público en cuestión. El uso de evidencia empírica puede ser un instrumento adecuado para hacer esta determinación. Además, la existencia de otras alternativas menos onerosas y menos lesivas para la consecución de los objetivos gubernamentales puede justificar una determinación de inconstitucionalidad de la actuación gubernamental.

En términos generales, la lesión a la intimidad personal debe ser mínima. Siguiendo la distinción elaborada por el caso *United States v. Martinez-Fuerte*, supra, esto tiene un carácter dual: en cuanto a la intrusión objetiva, es decir en cuanto al alcance y la duración de la detención, ésta ha de ser breve. Por ello, en ausencia de otras circunstancias que originen motivos fundados para creer que se ha cometido algún delito, resulta excesivo requerirle a una persona que baje del auto, o hacerle preguntas más allá de las necesarias para establecer la identidad del conductor o requerirle los documentos que acrediten su legitimidad como conductor. Véase *Igersoll v. Palmer*, supra, (en el que existía personal que tomaba el tiempo de duración de las detenciones, las cuales en su fase inicial tenían una duración aproximada de veintiocho (28) segundos, y las de las personas que eran llevadas a una segunda área de examen de seis (6) minutos con trece (13) segundos).

En cuanto a la intrusión subjetiva, o la intrusión causada por el elemento de aprehensión o sorpresa que genera en las personas la realización del bloqueo, debemos señalar lo siguiente: (1) el bloqueo tiene que ser claramente visible, por ello el grado de iluminación que exista en el lugar, así como la existencia de avisos a una distancia razonable que

indiquen la actividad policial en la zona resultan importantes, véase *United States v. Hernandez*, 739 F.2d 484 (9no Cir. 1984), *cert.* denegado, 469 U.S. 1021 (1984); (2) la operación del bloqueo debe garantizar la seguridad de los que por allí transiten, y (3) la interferencia con el flujo normal del tránsito debe ser mínima o, en todo caso, razonable.([11])

Por otro lado, para que una detención de un vehículo de motor en un bloqueo de carreteras sea razonable bajo nuestro esquema constitucional deben existir criterios objetivos que eliminen la arbitrariedad por parte de los agentes estatales. Criterios como la raza, el sexo o la edad de los ocupantes son sencillamente insostenibles bajo nuestro esquema constitucional.([12]) Por ello, en el caso de que todos los vehículos no sean detenidos, deben establecerse previamente patrones objetivos para que las detenciones no sean discriminatorias.([13])

La arbitrariedad de los oficiales en el campo puede ser controlada, a su vez, con la existencia de guías previamente establecidas por *oficiales supervisores.* La participación de oficiales superiores en la elaboración de estas guías ha sido vista como un mecanismo adecuado para minimi-

---

([11]) En otras jurisdicciones este último aspecto ha sido un factor crucial al momento de determinar el grado de interferencia con la libertad e intimidad individual de la que ha sido objeto una persona. Véanse: *Merrett v. Moore*, supra; *United States v. Place*, 462 U.S. 696 (1983); *Ingersoll v. Palmer*, 743 P.2d 1299, 1316 (Cal. 1987), (en el que se dijo: "Minimizar el tiempo promedio durante el cual cada conductor está detenido es crítico tanto para reducir el grado de intrusión de la detención como para mantener la seguridad evitando congestiones de tránsito").

([12]) Llamamos la atención sobre un comunicado de prensa difundido por la American Civil Liberties Union (en adelante A.C.L.U.) en 22 de mayo de 1996. En éste, la A.C.L.U. difundía los resultados de un estudio que concluía que en el estado de Maryland los conductores negros eran detenidos y registrados por la Policía en busca de drogas ilícitas en una proporción cuatro (4) veces mayor que las detenciones de las cuales fueron objeto conductores blancos, lo que podría reflejar un patrón de detenciones fundamentadas en consideraciones raciales. Tal práctica es sencillamente insostenible, tanto bajo nuestra Constitución como bajo la Constitución federal.

([13]) Véanse, por ejemplo: *State v. Barcia*, 562 A.2d 246 (1989), (en este caso se detenía un vehículo por cada veinte (20) que pasaban por el bloqueo); *Ingersoll v. Palmer*, supra, (en el que se detenía cada quinto vehículo que transcurría por el bloqueo).

zar el grado de discreción que se le deja al oficial que labora en la operación del bloqueo. Véase *Little v. State*, supra. Dichas guías deben incluir aspectos como hora, duración de los bloqueos, normas de seguridad, criterios de detención de vehículos y otros procedimientos inherentes a la operación del bloqueo que restrinjan el ejercicio de discreción por parte de los agentes en el campo. Una vez se hayan adoptado estas normas o guías, ellas deben ser cumplidas de forma estricta. Véase *Com. v. Anderson*, 547 N.E.2d 1134 (1989), (en el cual el tribunal declaró inconstitucional el bloqueo impugnado debido a que la duración previamente establecida fue prolongada sin seguir las normas preestablecidas para su extensión).

Los anteriores lineamientos doctrinales le imprimen razonabilidad según nuestra Constitución a la incautación que representa una detención en un bloqueo de carreteras. Ante una impugnación judicial de este tipo de actuación gubernamental, por constituir una incautación sin una orden judicial previa, compete al Estado probar su razonabilidad.

■ Advertimos, sin embargo, que pueden surgir instancias que ameriten la realización de un bloqueo de una vía sin que sea estrictamente necesario cumplir con los parámetros de razonabilidad que hemos esbozado. Tal puede ser el caso de una situación de emergencia que requiriera de la Policía cercar un área o poner una barricada en determinado lugar como medida protectiva. Estas instancias excepcionales podrían justificar un desvío de la norma general que hemos postulado y deberán ser examinadas a la luz de los hechos concretos en las que surjan.[14]

Con este trasfondo, evaluemos el contexto de la detención de la que fue objeto el señor Yip Berríos.

---

[14] Algunas situaciones que podrían ser consideradas como situaciones de emergencia son insurrecciones, amenazas con explosivos y situaciones que involucren rehenes, entre otras. Véase W.R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, 3ra ed., Minnesota, Ed. West Publishing Co., 1996, Vol. 4, pág. 64 *et seq.*

## VI

El bloqueo de carreteras bajo nuestra consideración fue efectuado por la Policía de Puerto Rico en la mañana de un viernes, sin previo aviso, en las tres (3) vías que permitían la entrada y salida al Residencial Virgilio Dávila en donde vivía el imputado Yip Berríos. Según surge de los autos del caso, en el bloqueo impugnado se detenían a todos los vehículos que intentaran entrar o salir al residencial sin que existiera algún grado de sospecha individualizada de que la persona detenida hubiera cometido un delito o alguna violación a las leyes de tránsito. Al ser detenidos, se solicitaba al conductor su licencia de conducir y la licencia del registro del vehículo. Bajo estas circunstancias fue que ocurrió la detención e incautación del vehículo en que viajaba Yip Berríos, que posteriormente desemboca en la percepción de la anomalía en la tablilla del vehículo y en la confiscación de la evidencia delictiva. Ante este cuadro debemos determinar si la detención inicial del vehículo de Yip Berríos fue constitucionalmente válida a la luz de los parámetros de razonabilidad que hemos delineado para las detenciones efectuadas en bloqueos de carreteras.

En su escrito, el Ministerio Público nos indica que el bloqueo de carreteras efectuado ese día en el Residencial Virgilio Dávila tenía como objetivo básico la revisión de las licencias de conducir y de registro del vehículo de los conductores que transitaran por las vías bloqueadas. Por ello nos afirma:

> El plan era el típico "bloqueo": solicitar del conductor de todo vehículo, que entrara o saliera, la registración [sic] del automóvil y la licencia del conductor. Alegato del peticionario, pág. 4.

Más adelante, el Ministerio Público nos señala que "[e]l bloqueo establecido por la policía en la mañana del 16 de abril de 1993 en el Residencial Virgilio Dávila es uno reconocido por *Delaware v. Prouse, supra*, para cotejar licencias del vehículo y de conductor". Alegato del peticionario, pág.

13. Por ello, nos plantea que el interés estatal en "proteger la propiedad vehicular y disminuir el crimen que se comete con ayuda de vehículos ilegalmente obtenidos, refuerza la validez de los bloqueos para cotejar licencias de conducir y de vehículos", y nos solicita que validemos el bloqueo efectuado en el caso de autos y, por ende, la detención del imputado Yip Berríos. Alegato del peticionario.

Ciertamente, la detección de delitos relacionados a las leyes de tránsito y de la propiedad vehicular es un interés estatal que merece considerable deferencia. De hecho, en el pasado hemos reconocido que "dada su movilidad el automóvil en ocasiones es el medio utilizado por los delincuentes para sus actividades ilícitas y que con frecuencia es el producto del delito". *Pueblo v. Malavé González,* supra, pág. 479. Sin embargo, un análisis ponderado de todas las circunstancias que rodearon la operación del bloqueo en el caso de autos presenta serias dudas sobre la validez de la contención gubernamental, en términos de que el bloqueo efectuado en el Residencial Virgilio Dávila tenía como objetivo principal la revisión sistemática de las licencias de conducir y de registro de los vehículos.

Debemos destacar que ese día la Policía estaba diligenciando varias órdenes de arresto en el mismo residencial donde fue efectuado el bloqueo de carreteras. No podemos concebir que la Policía haya efectuado ambas gestiones de forma simultánea sin una planificación previa al respecto. No obstante, el Ministerio Público no nos expresa que éste fuese realizado como medida cautelar para evitar la evasión de alguna de las personas cuyas órdenes de arresto estaban siendo diligenciadas. Ni siquiera nos señala que el bloqueo fue efectuado como medida excepcional para aplacar una situación de peligrosidad o emergencia para el público. El Estado descansa única y exclusivamente en el argumento de que el bloqueo fue efectuado como un "típico bloqueo" para revisar las licencias de los vehículos de las personas que por allí transitaban. Aunque ante nos tan

sólo se ha planteado la validez de la detención de Yip Berríos en el bloqueo de carreteras, el operativo que estaba siendo realizado en el residencial de forma simultánea con el bloqueo sugiere que el objetivo principal de éste no era exclusivamente la revisión sistemática de las licencias de conducir y de registro de los que transitaran por ellos como plantea el Ministerio Público. "Los jueces no debemos, después de todo, ser tan inocentes como para creer declaraciones que nadie más creería." *Pueblo v. Luciano Arroyo*, 83 D.P.R. 573, 582 (1961).

El bloqueo del caso de autos se asemeja al tipo de bloqueos que en otras jurisdicciones ha sido rechazado por carecer de un objetivo o interés público específico que lo motive, y por ser estructurado con objetivos diversos o, dicho en otras palabras, "en busca de alguien que haya cometido un delito". Véanse: *Hagood v. Town of Town Creek*, 628 So. 2d 1057 (1993); *Galberth v. U.S.*, supra; *Wirin v. Horrall*, 193 P.2d 470 (Cal. 1948). En este sentido, el bloqueo impugnado reúne las características del tipo de bloqueo que el profesor LaFave nos advierte que representa un serio atentado a la garantía constitucional contra registros y allanamientos irrazonables cuando expresa:

> It is not permissible for the police to celebrate Buglary Prevention Week by setting up random roadblocks to search cars for burglary tools, to blockade a highcrime area of that city and search all cars leaving that area, or to establish roadblocks "to curb the juvenile problem" or for the purpose of "deterring drug traffic and violence". Such tactics as these pose "the most serious threat to the interest in privacy". (Escolios omitidos.) W.R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, 3ra ed., Minnesota, Ed. West Publishing Co., 1996, págs. 313–314.

Por otro lado, no nos parece que la ubicación del bloqueo en las entradas del residencial haya sido el mecanismo más adecuado para detectar violaciones a las leyes de tránsito y de propiedad vehicular. Es preciso resaltar que los afectados por el bloqueo eran prácticamente quienes habi-

taban en el residencial y no la población en general que transcurre por otras vías, incluso más concurridas, y en donde la ubicación del bloqueo hubiese representado una forma más adecuada de adelantar el interés estatal postulado. El Estado no proveyó evidencia que demostrara que en el residencial Virgilio Dávila existiera un serio problema relacionado con las leyes de tránsito o que por el residencial transitara un gran número de vehículos. En este sentido no ha demostrado que la ubicación del bloqueo hiciera del medio utilizado el más razonable para adelantar el interés señalado por el Estado de revisar licencias de conducir y de registro de los vehículos.

Asimismo, las características del bloqueo efectuado en el Residencial Virgilio Dávila revelan que el grado de intrusión a la intimidad de la cual fueron objeto quienes por allí transitaban fue de considerable envergadura. Al bloquear los tres (3) accesos del residencial, se afectó de forma exclusiva a las personas que residían allí. Quien quisiera salir o entrar a éste en automóvil necesariamente tenía que pasar por el bloqueo. De este modo, más que un bloqueo de carreteras, nos encontramos ante *una ocupación de una comunidad en particular.*

Nótese, además, que el bloqueo impugnado fue realizado a tempranas horas de la mañana, cuando las personas usualmente salen de sus hogares en dirección a sus trabajos, a la escuela, o a realizar todo tipo de actividades en nuestra sociedad. Fue en ese momento cuando se intervino con todas las personas que salían de sus hogares en sus vehículos. Estas circunstancias tienen el efecto de agravar la magnitud de la intrusión a la intimidad individual de las personas que por allí transitaban, incluyendo la del recurrido Yip Berríos.

Por otro lado, un análisis ponderado de los autos revela que el bloqueo fue efectuado sin que existieran normas o guías que delimitaran el ámbito de acción de los policías asignados al bloqueo. De hecho, en su escrito, el Ministerio

Público no nos expresa que el bloqueo vehicular fuera realizado como parte de un plan previo, concebido bajo normas neutrales que limitara la posibilidad de arbitrariedad por parte de la Policía. El Ministerio Público, en cambio, nos invita a que validemos la detención efectuada en el Residencial Virgilio Dávila por el solo hecho de que allí se intervenía con todos los vehículos que transitaban por las vías bloqueadas, de forma que no existía arbitrariedad alguna en las detenciones. Apoya esta contención en *Delaware v. Prouse*, supra.

Ciertamente, en *Delaware v. Prouse*, supra, el Tribunal Supremo federal deja implícita la posibilidad de realizar bloqueos de carreteras por parte de la Policía, bajo circunstancias en las que no exista arbitrariedad en la detención de los vehículos. No obstante, en *Prouse* no se decretó la constitucionalidad a priori de todo bloqueo en el que se detuviera a todos los conductores que transcurrieran por ellos. Las expresiones de ese foro tan sólo deben ser entendidas en el sentido de que una posible alternativa para eliminar la arbitrariedad en la operación de los bloqueos podría ser la detención de todos los vehículos. Sin embargo, la existencia de arbitrariedad en la detención de los vehículos no es el único factor que debe ser considerado para determinar la validez de un bloqueo. Es preciso evaluar cada bloqueo caso a caso para determinar cuán razonable ha sido la actuación gubernamental a la luz del balance de los intereses involucrados y de la totalidad de las circunstancias que rodean su operación.

Ante todo lo anterior, concluimos que la detención de la cual fue objeto el imputado Yip Berríos violentó la protección constitucional contra registros, allanamientos e incautaciones irrazonables que provee nuestra Carta de Derechos. El Estado no probó la validez constitucional de la incautación de la persona, por lo que no erró el tribunal de instancia al decretar la supresión de la evidencia.

Aún considerando los hechos del caso de autos a la luz

del mínimo que provee la Constitución de Estados Unidos en su Cuarta Enmienda, es decir, bajo un criterio de razonabilidad menos estricto, llegaríamos a la misma conclusión. En primer lugar, el bloqueo que plantea el caso de autos es distinto al tipo de bloqueos que ha sido validado por el Tribunal Supremo de Estados Unidos en *United States v. Martinez-Fuerte*, supra, y en particular por el hecho de que más que un bloqueo de carreteras, la gestión policial constituía un bloqueo de toda una comunidad. En segundo lugar, un análisis de la razonabilidad del bloqueo efectuado, a la luz del escrutinio de razonabilidad desarrollado en la jurisdicción federal, nos lleva a concluir que la intrusión a la intimidad resultante fue irrazonable. Nótese que el interés postulado no puede ser eficientemente adelantado mediante la metodología utilizada. La ubicación del bloqueo, como antes expresamos, limita en gran medida la eficiencia que pueda tener en adelantar el objetivo postulado. Enfrentados estos factores con la intrusión a la intimidad que experimentó Yip Berríos y los otros habitantes del residencial, bajo el análisis federal, la decisión debe recaer a favor del imputado.

Detener conductores cuando salen de sus residencias a tempranas horas de la mañana, en sus propias comunidades, para revisar sus licencias de conducir y de registro infringe de forma considerable la intimidad de las personas, más aún cuando el bloqueo no forma parte de un plan estructurado bajo guías neutrales. Este grado de intrusión no puede ser justificado con el interés de velar por el cumplimiento con las leyes sobre vehículos de motor, aun bajo el mínimo de protección individual garantizado al amparo de la Cuarta Enmienda de la Constitución de Estados Unidos, *supra*.

## VII

Resta considerar la constitucionalidad de la Sec. 5–1120(a) de la Ley de Vehículos y Tránsito de Puerto Rico, *supra*, que hiciera el Magistrado de instancia. La sección declarada inconstitucional dispone:

(a) Todo conductor de vehículos deberá detenerse inmediatamente cuando un agente del orden público se lo requiriere y vendrá obligado igualmente a identificarse con dicho agente si así éste se lo solicitare, y también deberá mostrarle todos los documentos que de acuerdo con este Capítulo y sus reglamentos debe llevar consigo o en el vehículo. 9 L.P.R.A. sec. 1152(a).

Como es sabido, desde la década de 1950 hemos expresado que los tribunales no debemos entrar a considerar la constitucionalidad o inconstitucionalidad de una ley o de una actuación a menos que sea imprescindible y que la controversia bajo consideración no pueda ser adjudicada por otros fundamentos. Véanse: *Pueblo v. Ramos Santos*, 138 D.P.R. 810 (1995); *Caquías v. Asoc. Res. Mansiones Río Piedras*, 134 D.P.R. 181 (1993); *Fac. C. Soc. Aplicadas, Inc. v. C.E.S.*, 133 D.P.R. 521 (1993); *P.P.D. v. Admor. Gen. de Elecciones,* 111 D.P.R. 199 (1981).

Esa es la situación del caso de autos. Una vez se ha determinado que la actuación gubernamental fue irrazonable y que, por lo tanto, la evidencia incautada debe ser suprimida, es innecesario considerar el planteamiento sobre la constitucionalidad de la Sec. 5-1120(a) de la Ley de Vehículos y Tránsito de Puerto Rico, *supra*. En este sentido, el foro de instancia se excedió al considerar el planteamiento sobre la constitucionalidad de la citada sección cuando existían otros fundamentos que permitían disponer del caso. Erró el tribunal de instancia al así actuar. Por ello, su determinación en cuanto a este aspecto debe ser revocada.

*Se dictará sentencia de conformidad.*

Los Jueces Asociados Señores Negrón García y Corrada Del Río disintieron. El Juez Asociado Señor Fuster Berlingeri no intervino.

— O —

Opinión disidente del Juez Asociado Señor Negrón García.

I

Bien sea separados o entremezclados, el área metropolitana —San Juan, Bayamón y Carolina— se compone de distintos núcleos comerciales y residenciales (privados y públicos), conectados por muchísimas calles secundarias, avenidas y expresos, tales como la Ponce de León y Fernández Juncos, en Santurce; la Carretera Núm. 2 hacia Bayamón, la Carretera Núm. 1 hacia Caguas, la 65 de Infantería hacia Carolina, y otras más. *Por esta inmensa red de vías públicas, transitan a todas horas, miles de vehículos.*

La mayoría del Tribunal hace hoy una abstracción de éstas y otras realidades, tales como el fenómeno del tránsito vehicular; su alta movilidad poblacional; las variadas actividades delictivas que ello genera, y los limitados recursos policiacos. Además, dictamina que es inconstitucional el bloqueo establecido por la policía en las carreteras que daban acceso al Residencial Virgilio Dávila, en Bayamón, dentro del cual se diligenciaban más de cincuenta (50) órdenes de allanamiento.

No debemos imponerle a la Policía, como camisa de fuerza judicial, una norma que limite los bloqueos únicamente a las carreteras, las avenidas o los expresos principales y excluya las vías secundarias que comunican directamente las áreas residenciales, ya sean privadas o públicas. Ciertamente, en las avenidas, carreteras principales y autopistas resulta muy difícil e impráctico realizar

bloqueos. ¿Van a permitirse éstos únicamente en esas zonas fluidas de gran tránsito? ¿Por qué excluir las calles que dan acceso hacia las áreas residenciales? Si lo hacemos, ¿cómo justificarlo en áreas comerciales o mixtas? Si el bloqueo cumple con las normas jurisprudenciales establecidas por numerosos tribunales, incluso el Tribunal Supremo federal, ¿por qué es *irrazonable* bajo la Constitución?, ¿cuál es la lesión al derecho a la intimidad?, ¿en qué consiste el discrimen?

Se tacha de ilegal un bloqueo *matutino* de las calles que dan acceso a un área residencial, a base de que afecta la intimidad de los que van a trabajar, llevar los niños a la escuela o realizar otras actividades. *Se trata de una especulación mayoritaria sin base en prueba alguna.* Además, ¿no se dan esas mismas situaciones en el contexto de una mayor proporción vehicular en la zona metropolitana, donde diariamente la transportación hacia el trabajo y la escuela asciende a miles de automóviles e incluye miles de personas, padres y estudiantes? ¿Implica que la Policía sólo puede hacerlo durante el mediodía o la noche? ¿Hay un horario particular constitucional para que la Policía aplique la Ley de Vehículos y Tránsito de Puerto Rico? En ese sentido debe quedar claro que el bloqueo, en el caso de autos, no fue frente a las salidas de unas residencias, como podría mal interpretarse, *sino en plena vía pública.*

La mayoría le atribuye un gran peso a que se bloquearon las únicas tres (3) vías que permitían la entrada y salida del Residencial Virgilio Dávila. *Bloqueo significa interrumpir y controlar una o varias vías de acceso.* También señala que, como resultado, la Policía detenía a todos los vehículos que intentaran entrar o salir del residencial, sin tener una sospecha particular de que determinada persona hubiese cometido un delito o violado las leyes de tránsito. *Ello no era ni es necesario.* Precisamente, para que un bloqueo sea válido, la abundante jurisprudencia federal y estatal requiere que éste no sea arbitrario ni selectivo; esto

es, como regla general, *deben detenerse todos los automóviles que por allí transiten.* Si se detuviera sólo a las personas sospechosas de haber cometido alguna violación a las leyes de tránsito, *no sería menester el bloqueo*, pues las Reglas de Procedimiento Criminal autorizan a un funcionario del orden público a detener sin orden previa a las personas que cometan un delito en su presencia.[1]

Esas afirmaciones mayoritarias y nuestras interrogantes nos llevan a un señalamiento central: *se ha ignorado la doctrina de que un bloqueo no es ilegal, aún cuando haya motivos mixtos u otros propósitos colaterales.* Así, en *Merrett v. Moore*, 58 F.3d 1547 (11mo Cir. 1995), el décimoprimer circuito recalcó la incuestionable autoridad de la Policía de llevar a cabo bloqueos para revisar la licencia de conducir y la registración de los vehículos. Sostuvo que cuando la Policía tiene un propósito legal, suficiente para justificarlo, el hecho de que lo utilice para interceptar drogas no lo torna inconstitucional. *U.S. v. McFaydem*, 865 F.2d 1306 (Cir. D.C. 1989), refrendó un bloqueo cuyo propósito principal era aplicar la ley de tránsito en relación con un programa de la Policía para combatir el tráfico de drogas.

Afirma la mayoría que este caso se asemeja al de otras jurisdicciones, donde la legalidad del bloqueo ha sido rechazada por carecer de un objetivo o interés público específico que lo motive, y haber sido estructurado con objetivos

---

[1] En su estructura interna, la opinión mayoritaria es sumamente contradictoria. De un lado, *nuevamente sin prueba alguna como base,* ponen en duda que el objetivo principal del bloqueo fuera la revisión sistemática de las licencias de conducir y de registro de los vehículos. *Aparte de ser totalmente especulativo,* nos dice que el Procurador General no nos ha expresado que el bloqueo fuese realizado como medida cautelar para evitar la evasión de alguna de las personas afectadas por las órdenes de registro que estaban siendo diligenciadas o, como medida excepcional, para aplacar una situación de peligrosidad o emergencia pública. ¿Significa que si así lo hubiese escrito en su comparecencia el Hon. Procurador General, hubiese quedado validado el bloqueo? ¿Está sugiriendo que otro motivo válido era la medida cautelar para evitar la evasión de alguna persona, o la seguridad de los agentes allí presentes?

diversos o, dicho en otras palabras, "en busca de alguien que haya cometido un delito". *Estamos otra vez ante un aserto mayoritario especulativo.* No hay la más mínima prueba de que la Policía, al detener otros vehículos y constatar la licencia de sus conductores y su registro, fuera más allá de esa leve intromisión y, usando el bloqueo como excusa, aprovechara para registrar sus personas o los interiores de los vehículos "busca[ndo] a alguien que hubiese cometido un delito".

*Nos parece insólito que este Tribunal no encuentre interés público alguno en el bloqueo.* Como muy bien señala el Señor Procurador General, las ramas políticas del Gobierno tienen la responsabilidad primaria de atacar el problema de la criminalidad mediante los medios más vigorosos y eficaces posibles, lo que implica recurrir a métodos clásicos o novedosos, a tono con la ingeniosidad, las nuevas modalidades y las artimañas delictivas. Aquí, el propósito de la Policía era detectar violaciones a las leyes de tránsito y de propiedad vehicular en las calles de acceso hacia un área residencial, mientras que, simultáneamente, se diligenciaban numerosas órdenes de allanamiento. *Por razón de esa operación, ¿cabe seriamente tachar el bloqueo de inconstitucional?*

La mayoría abandona su papel de juzgador al concluir que la ubicación del bloqueo no era el mecanismo policial más adecuado. Sustituye así al informado criterio policiaco para decidir cuándo y dónde hacerlo. En *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444 (1990), el Tribunal citó a *Brown v. Texas*, 443 U.S. 51 (1979). Al describir el factor del balance como "el grado en el cual la detención promueve el interés público", señaló que para propósitos del análisis de la Cuarta Enmienda, *la selección dentro de las alternativas razonables correspondía decidirla y pertenece a los oficiales de la Policía, quienes tienen una clara perspectiva de los recursos limitados que proveen y la responsa-*

*bilidad de usarlos de la manera más eficiente. No es una función judicial establecer los horarios, la frecuencia y los sitios del bloqueo; ello debe recaer sobre la Policía.*

La mayoría sostiene que el Estado no proveyó prueba alguna que demostrara que en el Residencial Virgilio Dávila existiera un serio problema relacionado con las leyes de tránsito o que por sus portones de acceso fluyera un gran número de vehículos. *No conocemos de ninguna decisión judicial que exija que la Policía tiene que conocer de violaciones de ley anteriores a hacer un bloqueo.* Ello desvirtúa sus objetivos, pues toda la jurisprudencia se concentra en una realidad no contradicha de la que Puerto Rico, con más de un millón setecientos mil (1,700,000) vehículos, no es la excepción: hay miles de conductores sin licencia y muchos vehículos con tablillas o matrículas alteradas que transitan de forma ilegal. Indubitadamente, existe un interés legítimo de la Policía en detectarlos. *Tampoco sabemos de decisión judicial persuasiva alguna que imponga el requisito de que la validez de un bloqueo depende de la cantidad vehicular que fluya por determinado lugar.* De hecho, ello puede tornar impráctico el bloqueo o para evitar un congestionamiento intolerable que genere y afecte más de lo necesario la libertad ciudadana y el movimiento vehicular, obligar a la Policía a no detener todos los vehículos, sino tener que, sistemáticamente —con vista a un criterio numérico fijo— dejar pasar algunos y detener otros. *Es fácilmente imaginable la gran congestión y los graves problemas que generaría un bloqueo en las carreteras y avenidas principales del área metropolitana.*

Para la mayoría del Tribunal, las características del bloqueo efectuado en el residencial Virgilio Dávila reveló un grado de intrusión a la intimidad de "considerable envergadura" hacia quienes transitaban por allí. Se apoya en que quien quisiera salir o entrar en automóvil necesariamente tenía que pasar por el bloqueo. *Esa es precisamente la idea de un bloqueo policial: que todos tengan que pasarlo*

*y sin excepción, ya que sería arbitrario que, sin justa causa, la Policía permitiera a algunos evadirlo al usar unas vías alternas. Además, es absurdo postular una tesis que deja a los conductores en libertad de decidir voluntariamente si pasan por un bloqueo o no; jamás la Policía podría cumplir a cabalidad con sus objetivos legítimos de verificar si son autorizados y sus vehículos están en orden.*

La mayoría menciona los casos en que este Tribunal ha expresado que la protección constitucional del Art. II, Sec. 10 de nuestra Constitución, L.P.R.A., Tomo 1, es *menor* en circunstancias que involucran automóviles. Aún así, en un salto al vacío, afirman de nuevo que la violación a la intimidad de Yip Berríos fue de "considerable envergadura". *Para sostenerlo, descansan en casos inaplicables que hablan sobre la razonabilidad de la detención de los vehículos de motor bajo circunstancias que originan motivos fundados.* Olvida que los bloqueos son válidos precisamente en circunstancias donde no hay tales motivos fundados, por existir intereses apremiantes del Estado (verificar las licencias de conductores y de registro de los vehículos), y representar el medio menos invasivo a la intimidad para alcanzarlos.

Con estas observaciones críticas preliminares en mente, expongamos sucintamente los hechos.

## II

El 16 de abril de 1993 la Unidad de Drogas de la Policía diligenció más de cincuenta (50) órdenes de allanamiento en el Residencial Virgilio Dávila, de Bayamón. Coetáneamente, los oficiales del Cuartel de Bayamón Norte *planificaron y ordenaron establecer bloqueos visibles* en las *tres (3) vías públicas* que daban acceso al residencial. Las órdenes impartidas por la oficialidad, en específico instruyeron a los agentes en los bloqueos, sin margen a discreción alguna, a detener *brevemente todo vehículo* que intentase pa-

sarlas y verificar la licencia de cada conductor y el registo y la inspección de los vehículos.

Ese día, a las 9:00 A.M., Henry Yip Berríos, quien residía en Virgilio Dávila, salió del residencial en un automóvil marca Saab. Al llegar a uno de los bloqueos, el policía Héctor Ruiz García del Cuartel de Bayamón Norte le ordenó detenerse. Como a todo conductor, le solicitó su licencia de conducir y el registro. Éste las entregó desde el interior del vehículo.

Al percatarse el agente Ruiz García de que el número de tablilla que llevaba el vehículo no correspondía al del registro —violación a la Sec. 2.801(7) de la Ley Núm. 141 de 20 de julio de 1960, Ley de Vehículos y Tránsito de Puerto Rico, 9 L.P.R.A. sec. 591(7)— le ordenó inmediatamente a Yip Berríos bajarse del vehículo. Al éste hacerlo, el agente observó, a plena vista, un arma de fuego (pistola Colt Commander .45, cargada con seis (6) balas) entre los dos (2) asientos delanteros. Le preguntó a Yip Berríos si tenía licencia para portarla. Al éste contestar en la negativa, el agente lo arrestó, le hizo las advertencias y lo registró. En ese registro se incautaron dos (2) envolturas plásticas transparentes, cuyo análisis subsiguiente demostró que contenían heroína envuelta en papel de aluminio.

Como resultado, el Ministerio Público lo acusó de violar la Sec. 2–801(7) de la Ley de Vehículos y Tránsito de Puerto Rico, *supra*; los Arts. 6, 8 y 11 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. secs. 416, 418 y 421, y el Art. 404(a) de la Ley de Sustancias Controladas de Puerto Rico, 24 L.P.R.A. sec. 2404(a). Yip Berríos solicitó *con éxito* la supresión de esa evidencia. El ilustrado foro de instancia concluyó que su detención inicial en el bloqueo violó sus derechos bajo el Art. 10 de nuestra Constitución, *supra*, y bajo la Cuarta Enmienda de la Constitución federal, *supra*. Además, decretó inconstitucional la Sec. 5–1120 de la Ley de Vehículos y Tránsito de Puerto Rico, 9 L.P.R.A. sec. 1152, por supuestamente permitir a la Policía la interven-

ción con vehículos de forma arbitraria y sin sospecha de actividad delictiva. A solicitud del Procurador General, revisamos.

La única cuestión ante nos es en cuanto a si fue válida la detención inicial en el bloqueo del automóvil conducido por Yip Berríos. Es unánime el consenso que, de serlo, las acciones posteriores del policía Ruiz García fueron legítimas.

### III

La Sec. 10 del Art. II de nuestra Constitución, *supra*,[2] protege a las personas, las casas, los papeles y los efectos contra registros, incautaciones y allanamientos *irrazonables*; prohíbe la interceptación de la comunicación telefónica, y requiere de un mandamiento judicial para autorizar registros, allanamientos o arrestos, sólo cuando exista causa probable apoyada en un juramento.

Sus párrafos primero y tercero son una traducción casi literal de la Cuarta Enmienda de la Constitución de Estados Unidos de América, L.P.R.A., Tomo 1.[3] Tanto la Sec.

---

[2] Tradicionalmente se ha ligado esta disposición a la Sec. 1 ("[l]a dignidad del ser humano es inviolable ...") y a la Sec. 8 ("[t]oda persona tiene derecho a protección de la ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar".) del Art. II, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, págs. 257 y 292, respectivamente. De estas tres disposiciones surge la protección constitucional a la intimidad de la persona.

[3] Para facilitar su comparación, reproducimos el texto en inglés de la Cuarta Enmienda:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S.C. Const. 4ta enmienda.

*Las diferencias son pocas. Primero*, la Sec. 10 del Art. II, L.P.R.A., Tomo 1, separa las dos (2) cláusulas de la Cuarta Enmienda, pues se intercaló la prohibición a la interceptación telefónica.

*Segundo*, la segunda cláusula en la citada Sec. 10 es más detallada que en la Cuarta Enmienda, ya que aclara que el mandamiento será expedido por una autoridad judicial. Además, especifica que el mandamiento podrá ser para autorizar registros, allanamientos o arrestos. La diferencia es más aparente que real, pues la palabra *warrant* denota todo lo que se añadió en la Sec. 10. No es la única instancia en que nuestra Constitución entra en más detalles que la federal.

10 como la Cuarta Enmienda, *supra*, están dirigidas a proteger el derecho a la intimidad.

*Sin embargo, este derecho no es absoluto y en ocasiones, ha de ceder ante intereses apremiantes del Estado. E.L.A. v. P.R. Tel. Co.*, 114 D.P.R. 394, 402 (1983). Para que puedan prevalecer los intereses del Estado sobre los derechos individuales, *la razonabilidad es el criterio rector*. De ordinario, éste se determina balanceando los derechos individuales con los del Estado. Se mide la necesidad gubernamental de llevar a cabo ciertas funciones frente a la importancia del derecho individual que se verá afectado. Claro está, lo que constituye una actuación gubernamental razonable varía de acuerdo con la protección dada por el ordenamiento a los derechos individuales; *aquí, la expectativa de intimidad de un conductor, reducida ante un bloqueo vehicular.*

Desafortunadamente, aun cuando la opinión mayoritaria reconoce este enfoque, según hemos expuesto, en su análisis incurre en unas incompatibilidades esenciales y en aseveraciones genéricas que le impiden balancear justa y satisfactoriamente esos intereses.

Esa conclusión no concuerda con la jurisprudencia interpretativa de nuestra Sec. 10, ni de la Cuarta Enmienda, homóloga y modelo de aquella. *Desde hace varios años el*

---

No obstante estas similitudes, nuestra jurisprudencia ha dado vida independiente a la citada Sec. 10, principalmente, debido al efecto que han tenido sobre esta sección las otras secciones aludidas de nuestra Carta de Derechos, las que también protegen el derecho a la intimidad. Igualmente se ha dicho que nuestra Carta de Derechos establece una protección el derecho a la intimidad "de factura más ancha" que la Constitución federal. Por lo tanto, la jurisprudencia del Tribunal Supremo federal, interpretativa de la Cuarta Enmienda, sólo nos obliga en cuanto a que establece los parámetros mínimos de protección constitucional.

*Sin embargo, la antedicha "factura más ancha" es descriptiva, no prescriptiva.* No debe dar lugar, irreflexivamente, a un proceso mediante el cual la norma constitucional puertorriqueña se determina *mecánicamente*, tomando como base el grado de protección a la intimidad establecido por la jurisprudencia del Tribunal Supremo federal y luego ensanchándolo. Que nuestra jurisprudencia establezca un grado mayor de protección que la federal es quizás predecible, pero no es ni debe ser un prerrequisito.

Nuestra Constitución requiere no que automáticamente establezcamos una protección mayor que la federal, sino una protección fundamentada en los principios que acoge nuestra propia Carta de Derechos. Si el razonamiento esbozado en la jurisprudencia de otras jurisdicciones nos convence, es perfectamente apropiado acogerlo.

*uso de bloqueos para cotejar licencias o para detectar a conductores ebrios se ha permitido por casi todo tribunal que ha tenido la oportunidad de evaluar tal práctica.*(⁴) Desde *Delaware v. Prouse,* 440 U.S. 648 (1979) —*dictum*— el tribunal indicó que su uso para cotejar licencias superaría sus preocupaciones de violaciones constitucionales. Sostuvo que excepto en las situaciones en que haya sospecha razonable de que un conductor carece de licencia, o de

---

(⁴) *State v. Bates,* 902 P.2d 1060 (N.M. App. 1995); *U.S. v. Treviño,* 60 F.3d 333 (7mo Cir. 1995); *Merrett v. Moore,* supra; *State v. Binion,* 900 S.W.2d 702 (1994); *U.S. v. Holloman,* 908 F. Supp. 917 (FL. 1995); *State v. Loyd,* 530 N.W.2d 708 (1995); *Hooten v. State,* 442 S.E.2d 834 (1994); *State v. Rodriguez,* 877 S.W.2d 106 (1994); *People v. Wells,* 608 N.E.2d 578 (1993); *Hagood v. Town of Town Creek,* 628 So. 2d 1057 (1993); *State v. MacDonald,* 856 P.2d 116 (Kan. 1993); *State v. Barker,* 850 P.2d 885 (Kan.1993); *People v. Cascarano,* 587 N.Y.S. 2d 529 (1992); *Davis v. Kansas Dept. of Revenue,* 843 P.2d 260 (Kan. 1992); *Brunson v. State,* 580 So. 2d 62 (1991), *reh.* denegado; *Galberth v. U.S.,* 590 A.2d 990 (1991); *Brimer v. State,* 411 S.E.2d 128 (1991); *State v. Sanchez,* 800 S.W.2d 292 (1990); *Michigan Dept. of State Police v. Sitz,* supra; *Orr v. People,* 803 P.2d 509 (Colo. 1990); *U.S. v. Morales-Zamora,* 914 F.2d 200 (10mo Cir. 1990); *State v. Bolton,* 801 P.2d 98 (*cert.* denegado) (N.M. 1990); *Cains v. State,* 555 So. 2d 290 (1989); *Camp v. State,* 764 S.W.2d 463 (1989); *State v. Gascon,* 811 P.2d 1103 (Idaho 1989); *U.S. v. McFayden,* supra; *State v. Mazurek,* 567 A.2d 277 (1989); *Commonwealth v. Lovelace,* 402 Mass. 1002 (1988); *State of Missouri v. Payne,* 759 S.W.2d 253 (1988); *Cobey v. State,* 533 A.2d 944 (1987); *State v. Valencia Olaya,* 736 P.2d 495 (N.M. 1987); *U.S. v. Corral,* 823 F.2d 1389 (10mo Cir. 1987); *Smith v. State,* 515 So. 2d 149 (1987); *People v. Little,* 515 N.E.2d 846 (1987); *Cardwell v. State,* 482 So. 2d 512 (1986); *United States v. Diaz-Albertini,* 772 F.2d 654 (10mo Cir. 1985), *cert.* denegado, 484 U.S. 822; *United States v. Lopez,* 777 F.2d 543 (10mo Cir. 1985); *State v. Garcia,* 481 N.E.2d 148 (1985), *reh.* denegado, 489 N.E.2d 168, *cert.* denegado, 481 U.S. 1014 (1986); *State v. Cloukey,* 486 A.2d 143 (1985); *People v. Bartley,* 475 U.S. 1068 (1985); *State v. Alexander,* 489 N.E.2d 1093 (1985); *State v. Martin,* 496 A.2d 442 (1985); *United States v. Obregon,* 748 F.2d 1371 (10mo Cir. 1984); *Stark v. Perpich,* 590 F. Süpp. 1057 (Minn. 1984); *States v. Deskins,* 673 P.2d 1174 (Kan. 1983); *Texas v. Brown,* 460 U.S. 730 (1983); *State v. Shankle,* 647 P.2d 959 (Or. 1982); *Garrett v. Goodwin,* 569 F. Supp. 106, 588 F. Supp. 825 (Ark. 1982); *United States v. Prichard,* 645 F.2d 854 (10mo Cir. 1981), *cert.* denegado, 454 U.S. 832, *reh.* denegado, 454 U.S. 1069 (1981); *State v. Coccomo,* 427 A.2d 131 (1980); *People v. Estrada,* 386 N.E.2d 128, *cert.* denegado, 444 U.S. 968 (1979); *State v. Miller,* 608 F.3d 315, *cert.* denegado 447 U.S. 926 (1979); *Sowers v. State,* 247 S.E.2d 225 (1978); *Irwin v. State,* 383 N.E.2d 1086 (1978); *State v. Frisby,* 245 S.E.2d 622, *cert.* denegado 439 U.S. 1127 (1978); *State v. Ruud,* 567 P.2d 496 (N.M. 1977): *State v. Bloom,* 561 P.2d 465 (N.M. 1977); *Brantley v. State,* 548 P.2d 675 (Okl. 1976); *United States v. Millar,* 543 F.2d 1280 (10mo Cir. 1976); *State v. Bidegain,* 541 P.2d 971 (N.M. 1975); *People v. Ingle,* 369 N.Y.S.2d 67 (1975); *United States v. Martinez-Fuerte,* supra; *State v. Swift,* 207 S.E.2d 459 (1974); *People v. Andrews,* 484 P.2d 1207 (Colo. 1971); *United States v. Croft,* 429 F.2d 884 (10mo Cir. 1970); *People v. Washburn,* 71 Cal. Rptr. 577 (1968); *State v. Severance,* 237 A.2d 683 (1968); *State v. Smolen,* 232 A.2d 339, *cert.* denegado, 231 A.2d 283, *cert.* denegado, 389 U.S. 1044 (1967); *People v. De la Torre,* 257 Cal.App.2d 162 (1967); *State v. Kabayama,* 246 A.2d 714 (1968); *Morgan v. Town of Heidelgberg,* 150 So. 2d 512 (1963), y *Commonwealth v. Mitchell,* 355 S.W.2d 686 (1962).

que su automóvil no esté registrado, o que ha cometido una violación de ley, su detención para revisar la licencia de conducir o el registro del automóvil *es irrazonable bajo la Cuarta Enmienda.* Sin embargo, *aclaró* que esa decisión no impedía que los estados desarrollaran métodos alternos que fueran menos invasivos o que no otorgaran discreción irrestricta, tales como los bloqueos.

*Michigan Dept. of State Police v. Sitz,* supra, reafirmó ese enfoque. El Tribunal Supremo federal avaló el bloqueo luego de hacer un balance entre el interés del Estado en prevenir conductores ebrios, la capacidad a la que puede, razonablemente, decirse que este sistema ayuda a alcanzar dicho interés y el grado mínimo de intrusión hacia los conductores individuales que sean detenidos momentáneamente. Con vista a *United States v. Martinez-Fuerte,* 428 U.S. 543 (1976), el Tribunal aclaró los elementos de "intrusión subjetiva" y el potencial de generar "miedo y sorpresa". Evaluó las detenciones en los puntos de inspección desde una percepción distinta, ya que la intrusión subjetiva —que genera la inquietud o el miedo en los conductores que cumplen las leyes— es apreciablemente menor, en caso de una detención en un punto de inspección o bloqueo, que en la detención que ocurre durante un patrullaje preventivo.

En *United States v. Martinez-Fuerte,* supra, el Tribunal federal explicó que los patrullajes preventivos son mayormente de noche, en carreteras poco transitadas; mientras que en los bloqueos, el conductor puede ver que otros vehículos también están siendo detenidos. Es un signo visible de la autoridad policiaca y hay menos posibilidades de que se atemorice o moleste por la intrusión individual.(5)

---

(5) La conclusión mayoritaria no armoniza con nuestra doctrina. Para recogerla de forma concisa, citamos íntegramente al Profesor Chiesa:

"Aquí es importante advertir que de lo que se trata es de *un balance de intereses entre el grado de expectativa razonable a la intimidad e intereses apremiantes del Estado.* De ahí que la protección es tanto mayor como sea mayor la expectativa

En resumen, la opinión mayoritaria, aunque aparentemente admite que el derecho a la intimidad no es absoluto, en su resultado lo desmiente. Sopesemos, pues, los intereses del ciudadano Yip Berríos y los del Estado, en aras de llegar a un resultado jurídico-constitucional correcto y justo.

## IV

Según expuesto, la citada Sec. 10 prohíbe los registros, las incautaciones y los allanamientos *irrazonables*. El término *irrazonable* no se define en la Constitución.

[E]l adjetivo *razonable* viene del latín "*rationabilis*" que significa "arreglado, justo, conforme a la razón; 2. ant. racional". *Diccionario de la Lengua Española, op. cit.*, T. II, pág. 1147. Como tal, es obrar con discernimiento. Versa sobre realidades eminentemente pragmáticas, de carácter relativo y flexible. No es estático. En diferentes épocas y momentos conlleva variados significados y grados. Se puede dar, en situaciones inesperadas, más o menos imperiosas y urgentes, en que la libertad y curso de acción para actuar en diversos modos se reduce notablemente. Lo razonable descansa en lo moderado, en la cautela, prudencia, en la acción u omisión. Por ende, la variabilidad en el comportamiento del ser humano involucrado en todo acto crimin[al] y los distintos trasfondos del acto (sitio,

---

razonable a la intimidad. Esto explica por qué hay mayor protección al hogar que a un vehículo. Por otro lado, mientras más fuerte sea el interés apremiante del Estado como justificante para la actuación gubernamental, mayor probabilidad de que prevalezca como razonable la actuación de éste; mientras más débil sea el interés apremiante como justificante, mayor probabilidad de que se declare irrazonable e ilegal la actuación, con efecto de aplicar la regla de exclusión. En un caso en que sea bien fuerte la expectativa razonable a la intimidad (como es el hogar) mientras es muy débil el interés apremiante del Estado para justificar el registro, es muy improbable que se sostenga como razonable la actuación gubernamental. Sólo casos extraordinarios, como el registro de emergencia, se justificarían. *En el otro extremo está la situación de una débil expectativa legítima a la intimidad —como la que tiene el ciudadano al conducir un vehículo por una vía pública muy transitada— frente a un fuerte interés apremiante del gobierno, como combatir el hurto de vehículos y evitar accidentes de tránsito; en esa situación resulta más probable justificar como razonable la detención del vehículo.*" (Énfasis suplido.) E. L. Chiesa, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1991, Vol. I, Sec. 6.13(B), págs. 406–407.

> hora, personas, edades, naturaleza y gravedad) son factores pertinentes para evaluar la razonabilidad de un registro y allanamiento hecho sin orden judicial. (Énfasis suplido.) *Pueblo v. Malavé González*, 120 D.P.R. 470, 491 (1988), opinión disidente.

A la luz de los elementos que nutren el criterio constitucional de razonable, forzoso es concluir que la balanza se inclina en favor de avalar la actuación de la Policía. *Primero*, incuestionablemente, el Estado tiene un interés no sólo legítimo, *sino de la más alta jerarquía, en reglamentar el tránsito vehicular.* En 1993 había un millón setecientos cuarenta mil trescientos setenta y un (1,740,371) vehículos registrados en el Departamento de Transportación y Obras Públicas. Bien es sabido que el automóvil es un instrumento sumamente peligroso, con el potencial de causar un grave daño o la muerte cuando se utiliza incorrectamente. *No es necesario repetir aquí las tristes estadísticas de muerte y de heridos causados por accidentes automovilísticos en Puerto Rico. Además, el automóvil es con frecuencia un instrumento u objeto del crimen.* El criminal utiliza el automóvil para trasladarse a la escena del crimen o para huir de ella. Para obstaculizar la identificación, algunos comúnmente varían sus características exteriores y le cambian la tablilla, como hizo Yip Berríos. Objeto del crimen, cada año miles de automóviles son hurtados. No sólo son víctimas sus dueños, sino la sociedad en general, por el impacto que ello tiene en la economía y los seguros. En los últimos años ha surgido una nueva categoría de delito: el llamado *carjacking*; fenómeno criminoso que ha obligado a comunidades residenciales enteras a aislarse y a controlar los accesos de entrada y salida vehicular. *Caquías v. Asoc. Res. Mansiones Río Piedras*, 134 D.P.R. 181 (1993).

Para combatir estos males, la Ley de Vehículos y Tránsito de Puerto Rico establece *dos (2) tipos generales de reglamentación.* Un grupo incluye las reglas directamente relacionadas con la conducción de vehículos, tales como los límites de velocidad, hacer virajes, detenerse y otros. 9 L.P.R.A. secs. 841–847. El otro grupo —descriptible como

de carácter prospectivo— crea un andamiaje administrativo para garantizar que los conductores sean capaces de conducir, que los vehículos estén en buenas condiciones para transitar y facilitar la labor de identificar y recobrar autos hurtados. Por ejemplo, la Ley de Vehículos y Tránsito de Puerto Rico requiere, bajo amenaza de sanciones civiles y penales, que todo conductor apruebe un examen de sus destrezas para obtener una licencia (9 L.P.R.A. secs. 651–722); que todo automóvil tenga tablilla y esté debidamente registrado y licenciado (9 L.P.R.A. secs. 401–592), y que sea inspeccionado anualmente (9 L.P.R.A. secs. 1191–1192).

Pero además de tener un interés legítimo *general* en reglamentar el tránsito vehicular, el Estado tiene un *interés apremiante* en utilizar el método específico que hoy invalida la mayoría. *Es decir, el Estado necesita poder establecer bloqueos de cotejo de documentación para garantizar que la ley se cumpla. De otro modo, los conductores tendrían pocos motivos para obtener y portar sus licencias, puesto que no sería muy probable que se encontrasen en la situación de tener que mostrárselas a funcionarios del orden público.* Estos bloqueos fomentan la observancia de las leyes de tránsito, pues incrementan la conciencia de los conductores de que verdaderamente se les podrá exigir mostrarlas. *No tiene sentido requerir el criterio clásico de causa probable, pues, de exigirse, a nadie le preocuparía conducir sin poseer licencia.*

*Las dificultades de la posición mayoritaria* quedan evidenciadas al establecer un requisito que condena la vigencia y eficacia de la Ley de Vehículos y Tránsito de Puerto Rico a un estado de impotencia social. Ante el constante fluir de miles de automóviles, *¿cómo puede la Policía, en el descargo de sus responsabilidades, determinar causa probable para creer que un conductor no está autorizado o no lleva la licencia consigo?* La única situación en que saldría a relucir este hecho sería, tangencialmente, cuando se le

detiene *por otra violación detectable de la Ley de Vehículos y Tránsito de Puerto Rico.* En tales situaciones, *no hay disuasivo independiente* que podamos conectar con la obligación de poseer y llevar la licencia; pues la violación por la cual fue detenido conlleva su propia penalidad.

*Segundo, la expectativa razonable de intimidad es significativamente menor cuando una persona conduce un automóvil por una vía pública.* La existencia de esa expectativa razonable de intimidad en los automovilistas, *aunque aminorada*, es la que activa y hace aplicable el requisito de *razonabilidad* de la citada Sec. 10 de nuestra Constitución, pues, de lo contrario, sería innecesario y un ejercicio de futilidad judicial intentar balancear los intereses implicados. La mayoría acepta que esta expectativa es *menor* que la que razonablemente puede tenerse en otros lugares o circunstancias. Aún así, su análisis no revela efecto alguno de esta expectativa reducida de intimidad en el ámbito permisible de los bloqueos. *O sea, el resultado al que se llega implica que se ha equiparado la expectativa de intimidad que se tiene en los automóviles, con la que se tiene en el hogar.* La única explicación posible para esta inferencia es que, aún tratándose de un bloqueo en que la Policía cumplió rigurosa y razonablemente con los parámetros de ley y lo ubicó en las vías públicas, *como limitó las vías públicas que conectaban la entrada y salida de un área residencial, un fíat judicial la ha llevado a aplicar criterios que corresponden únicamente a la protección de la intimidad de un hogar.*

Al así hacerlo, pasa por alto que, *por ser menor la expectativa de intimidad en un automóvil, es que se ha considerado constitucional el uso de bloqueos.*

Ello nos lleva a considerar dos (2) posibles interpretaciones de la decisión mayoritaria; una, el grado de reducción vehicular en la expectativa de intimidad *es casi imperceptible*; la otra, que *no se le da el debido peso* a la jurisprudencia citada que establece un grado de expectativa menor.

*Tercero*, hemos visto que la invasión a la intimidad que sufrió Yip Berríos fue *sumamente leve*. Meramente detuvo la marcha y le entregó al oficial Ruiz García su licencia de conducir y la del automóvil. Si, como también acepta la mayoría, el grado de intromisión en un bloqueo en que se interviene con todos los conductores es sustancialmente menor, ¿cómo decretar, entonces, que se violó su derecho a la intimidad?([6])

*La intrusión con Yip Berríos fue mínima. Detener su automóvil era necesario, como única forma de cotejar las licencias.* Ni siquiera en ese momento se le ordenó que bajara del automóvil. No fue sino hasta después, cuando surgió la causa probable de que violaba la Ley de Vehículos y Tránsito de Puerto Rico, que el oficial Ruiz García se lo ordenó.

*La actuación policial fue un ejemplo de mesura y consideración.* Al igual que a otros conductores, se le exigió a Yip Berríos sólo lo mínimo y necesario para llevar a cabo la función cuasi administrativa que justificaba el bloqueo: entregar y cotejar licencias. *No se utilizó ésta más allá, ni como un subterfugio para llevar a cabo registros ilegales de los conductores y sus automóviles.* La decisión de establecer el bloqueo de forma tal que todo conductor que transitaba esas calles tuviese que mostrar su licencia se tomó en el Cuartel de Bayamón. Mediante este plan, se intentó evitar los abusos que conllevaría el ejercicio sin controles de la discreción de los oficiales individuales para ordenar la detención de vehículos. Al hacer esto, la Policía implantó las medidas básicas avaladas por el Tribunal Supremo federal en *Delaware v. Prouse*, supra, y *Michigan Dept. of State Police v. Sitz*, supra, y la abundante jurisprudencia antes citada.

*Al balancear los tres (3) factores discutidos, concluimos*

---

([6]) Es de notar, además, que no existe una expectativa razonable de intimidad en la licencia de conducir, puesto que estamos ante un documento oficial. *Pueblo v. Domínguez Fraguada*, 105 D.P.R. 537, 544 (1977).

que el uso del bloqueo para cotejar licencias de automóviles, en especial el procedimiento que se siguió en este caso, fue razonable y acorde con la Constitución.

La opinión mayoritaria da a entender que la evidencia debe ser suprimida por ser fruto de una operación supuestamente ilegal. Implícitamente descansa en la doctrina del fruto del árbol ponzoñoso. *Es ello un error. No era necesario llevar a cabo la operación de diligenciar más de cincuenta (50) órdenes de allanamiento dentro del residencial para válidamente establecer el bloqueo; su constitucionalidad no dependía de la realización de esa operación.*

## V

Finalmente, es errónea la decisión del ilustrado tribunal de instancia que declara inconstitucional la Sec. 5–1120(a) de la Ley de Vehículos y Tránsito de Puerto Rico. Dispone:

> (a) Todo conductor de vehículos deberá detenerse inmediatamente cuando un agente del orden público se lo requiere y vendrá obligado igualmente a identificarse con dicho agente si así éste se lo solicitare, y también deberá mostrarle todos los documentos que de acuerdo con este Capítulo y sus reglamentos debe llevar consigo o en el vehículo. 9 L.P.R.A. sec. 1152(a).

Al respecto, dicho foro concluyó que esta subsección daba carta blanca a todo policía para detener cualquier automóvil, sin algún tipo de control sobre tal decisión, y que esa delegación de autoridad violaba los derechos de los ciudadanos protegidos al amparo de la citada Sec. 10 del Art. II de la Constitución.

Esta disposición no otorga poderes tan amplios a la Policía como estima dicho tribunal. Su lenguaje no va encaminado a establecer la autoridad de la Policía, sino a detallar las obligaciones de los ciudadanos *ante un reclamo policíaco autorizado.* Sin embargo, la autorización policíaca no surge de ésta, *sino de otras fuentes estatutarias o*

*reglamentarias*; las cuales, claro está, deberán ajustarse a los requisitos de la Sección 10, *supra. En su redacción, la obligación se describe en términos absolutos porque no se puede dejar al criterio arbitrario de cada conductor si va a detenerse o no cuando un policía lo requiera; pero no se exime al policía de su obligación de acatar los mandamientos constitucionales.*(⁷)

Recapitulando, *primero*, la Policía tenía y tiene un interés legítimo y apremiante en reglamentar el tránsito vehicular, en particular mediante el uso de bloqueos para cotejar a todos los conductores, como única manera de dar vigencia con efectividad al requisito de las licencias; *segundo*, Yip Berríos, como conductor, tenía una expectativa razonable de ver su intimidad *reducida significativamente* al transitar en un vehículo por las vías públicas; *tercero*, el método utilizado por la Policía fue sumamente razonable y produjo sólo una leve y permisible invasión a su intimidad.

*No hay razón constitucional alguna para que sus delitos queden impunes.*

---

(⁷) Tampoco cabe una interpretación limitada de la autoridad de los Agentes del Orden Público bajo la Sec. 5–1120(c) de la Ley de Vehículos y Tránsito de Puerto Rico, 9 L.P.R.A. sec. 1152(c). Dispone:

"(c) Podrá la Policía detener o inspeccionar cualquier vehículo *cuando a su juicio el mismo estuviere siendo usado en violación de este Capítulo* o de cualquier otra disposición legal reglamentando la operación de vehículos u otras leyes o estuviere su conductor u ocupantes relacionados con cualquier accidente de tránsito. A tales fines, estará autorizada para bloquear el paso de dicho vehículo en cualquier vía pública cuando el conductor del mismo se negare a detenerse." (Énfasis suplido.)

Esta subsección no define la extensión completa de la autoridad de la Policía para detener vehículos, ni cubre el universo de posibles intervenciones. *Su texto va dirigido a limitar la discreción de cada policía, mientras patrulla las vías públicas.*

Sin embargo, ello no aplica cuando la organización policíaca establece un plan objetivo para el control de tráfico. Por ejemplo, pueden establecerse bloqueos en los que se detengan todos los vehículos en una o varias vías específicas. El elemento común entre la detención ordenada por un policía "cuando a su juicio el [vehículo] estuviere siendo usado en violación de este Capítulo", y la detención ordenada como parte de un bloqueo, *es que en ambos casos la discreción del oficial ha sido controlada y canalizada de tal forma que se evita la invasión irrazonable de la expectativa de intimidad de los conductores.*

Como concluyó el Tribunal Supremo de Estados Unidos en *Delaware v. Prouse*, 440 U.S. 648 (1979), y en *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444 (1990), estas salvaguardas satisfacen los requisitos constitucionales.

— o —

Opinión disidente emitida por el Juez Asociado Señor Corrada Del Río.

I

En esta ocasión se presenta ante nos el Ministerio Público, quien solicita que revoquemos una resolución emitida el 10 de noviembre de 1993 por el Tribunal Superior, Sala de Bayamón. Mediante dicha resolución el tribunal de instancia concluyó que era inconstitucional un bloqueo de vías públicas efectuado por la Policía de Puerto Rico para cotejar la licencia de conductor y otra documentación de los automóviles detenidos y ordenó la supresión de cierta evidencia obtenida como resultado de dicha intervención.

Luego de examinar y estudiar con detenimiento los autos del caso, entendemos que la Constitución federal y la de Puerto Rico no prohíben que la Policía bloquee una vía pública para detener indiscriminadamente a todos los vehículos que transiten por ella, bajo las circunstancias aquí presentadas. Bloqueos con estas características no violentan las protecciones constitucionales sobre registros y allanamientos; constituyen, sin embargo, un método efectivo para conseguir que se cumplan intereses esenciales del Estado, así como para que se acate la ley de tránsito y se mantenga el orden público. Encontramos, además, que este tipo de bloqueo no somete a los transitantes de las vías públicas a una inspección irrazonable de sus documentos de tránsito, y que una irregularidad sospechosa en éstos puede crear motivos fundados para practicar un registro sin previa orden judicial cuando se puede observar a simple vista la presencia de un arma de fuego.

Por los criterios antes expuestos, disentimos de la opinión que hoy emite la mayoría.

## II

El bloqueo de carreteras en cuestión se llevó a cabo durante la mañana del viernes 16 de abril de 1993. Esa mañana, la Policía bloqueó las tres (3) vías de acceso al Residencial Virgilio Dávila en Bayamón. Mediante el bloqueo de estas vías de acceso al residencial, la Policía pretendía detener a todos los vehículos que se dispusieran a entrar o salir de éste.[1]

Es esencial recalcar que, a pesar de que la detención de estos automóviles se efectuó sin que existiera sospecha de que las personas que se encontraban en los vehículos habían cometido un delito, *todos los vehículos que transitaron por esas tres (3) calles durante el bloqueo fueron detenidos, lo que indica que la detención de éstos no se determinó selectivamente, o de manera arbitraria, sino indiscriminadamente.*[2]

Mientras se llevaba a cabo el bloqueo de tránsito vehicular, alrededor de cincuenta (50) agentes de la Policía se desempeñaban en diligenciar más de cincuenta (50) órdenes de allanamiento en el Residencial Virgilio Dávila.

A eso de las 9:00 de la mañana, el imputado Henry Yip Berríos, quien conducía un automóvil Saab color verde, modelo de 1983, en dirección a una de las salidas del residencial que se encontraba bloqueada, fue detenido por miembros de la Uniformada. Según la declaración del policía estatal Héctor Ruiz García, al imputado se le pidió que mostrara su licencia de conducir y la del registro del vehículo. El señor Yip Berríos entregó los documentos requeridos. Al inspeccionarlos el oficial Ruiz García se per-

---

[1] Véase Transcripción de la Vista Evidenciaria de 28 de septiembre de 1993, pág. 3.

[2] El hecho de que el imputado viviera en el Residencial Virgilio Dávila podría dar a entender que el bloqueo de las vías de acceso a dicha comunidad tenía el propósito de detener selectivamente a todos los vehículos de los residentes de *esa* comunidad. Sin embargo, no podemos olvidar que dichas vías son públicas y abiertas al acceso y uso de cualquier persona, fuera ésta residente, visitante, transeúnte o extraña al lugar.

cató de que la licencia del automóvil indicaba un número de tablilla (50-B-92) distinto al de la tablilla expuesta por el vehículo (AWM-422). El oficial entonces observó un arma de fuego (una pistola Colt Commander, calibre .45, cargada con seis (6) balas), la cual se encontraba colocada entre los asientos delanteros del automóvil. El oficial le preguntó al imputado si tenía la debida licencia para portar el arma. Luego del imputado contestar en la negativa, se le arrestó y se le hicieron las advertencias requeridas por la ley.(3) Fue entonces que se registró al imputado, encontrando en su persona dos (2) envolturas que contenían lo que posteriormente se identificó como heroína.

El Ministerio Público acusó al imputado de violar la Sec. 2–801(7) de la Ley de Vehículos y Tránsito de Puerto Rico, 9 L.P.R.A. sec. 591(7), los Art. 6, 8 y 11 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. secs. 416, 418 y 421 y el Art. 404(a) de la Ley de Sustancias Controladas de Puerto Rico, 24 L.P.R.A. sec. 2404(a). Acogiendo lo solicitado mediante una moción de supresión de evidencia presentada por el imputado, el Tribunal Superior, Sala de Bayamón, dictó resolución el 10 de noviembre de 1993. En ésta se encontró que el bloqueo efectuado contravenía las disposiciones de la Sec. 10 del Art. II de la Constitución de Puerto Rico,

---

(3) En su primer escolio, la mayoría admite que existe una incongruencia sobre si al imputado se le ordenó bajarse del automóvil que ocupaba antes o con posterioridad al policía percatarse a plena vista del arma de fuego. Opinión mayoritaria, pág. 394. Sin embargo, en su relación de hechos, la mayoría entiende que el policía le ordenó al imputado salir del vehículo antes de haber visto dicha arma.

Existe una confusión sobre cuándo se le ordenó al imputado bajarse del automóvil. En la Vista de Supresión de Evidencia, el juez de instancia mencionó que fue después de que el imputado contestó que no tenía los documentos relacionados al arma de fuego, que se le ordenó desalojar el vehículo. Véase la Transcripción de la Vista Evidenciaria de 28 de septiembre de 1993, pág. 3. Por otra parte, la resolución recurrida indica que al imputado le fue ordenado bajarse del automóvil antes de ser observada el arma de fuego. Ciertas expresiones del policía estatal Héctor Ruiz García parecen apoyar esa segunda cadena de eventos. Véase Petición de *certiorari*, Apéndice IV, pág. 31. No obstante, entendemos que esa interrogante es inmaterial a la controversia constitucional ante nos, dado el hecho de que la incongruencia en la tablilla del vehículo antes indicada era motivo suficiente para que se le requiriese al imputado salir del vehículo, por lo que procedemos con nuestro análisis sin darle más consideración a ésta.

L.P.R.A., Tomo 1, y la Cuarta Enmienda de la Constitución de Estados Unidos, L.P.R.A., Tomo 1.([4])

## III

Las disposiciones pertinentes de la Sec. 10 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, *supra*, ed. 1982, pág. 299, exponen lo siguiente:

10. [Registros e incautaciones; intercepción de comunicaciones telefónicas; mandamientos]
No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.

. . . . . . . .

Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar a registrarse, y las personas a detenerse o las personas a ocuparse.
Evidencia obtenida en violación de esta sección será inadmisible en los tribunales.([5])

---

([4]) Nos parece de poca utilidad la interrogante planteada por la mayoría sobre si el "objetivo principal [del bloqueo] no era exclusivamente la revisión sistemática de las licencias de conducir y de registro de los que transitaran" por las vías bloqueadas. Opinión mayoritaria, pág. 390. Como señaló el Tribunal Superior, no podemos divorciar el bloqueo que la Policía efectuó del operativo de diligenciamiento de órdenes de allanamiento simultáneamente efectuado en los predios del residencial. Sin embargo, para efectos de nuestra evaluación constitucional del aludido bloqueo de tránsito vehicular, debemos enfocar nuestra consideración al hecho de que la Policía fue estacionada en estas vías con órdenes de detener los vehículos *para verificar la licencia, inscripción e inspección de éstos* y no para otros fines.

([5]) La Sec. 10 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1, concede la protección constitucional brindada al nivel federal por la Cuarta Enmienda de la Constitución de Estados Unidos, L.P.R.A., Tomo 1. Véanse: *Pueblo v. Santiago Alicea I*, 138 D.P.R. 230 (1995); *Pueblo en interés menor N.O.R.*, 136 D.P.R. 949 (1994); *Pueblo v. Martínez Torres*, 120 D.P.R. 496, 500 (1988); 3 Diario de Sesiones de la Convención Constituyente 1568 (1952), y J. Trías Monge, *Historia Constitucional de Puerto Rico*, San Juan, Ed. U.P.R., 1982, Vol. III, pág. 191.

Por su parte, la Cuarta Enmienda de la Constitución de Estados Unidos expresa que:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Cuarta Enmienda, Const. EE. UU., U.S.C.

Hemos establecido que como regla general todo registro, allanamiento o incautación que se realice, bien sea de índole penal o administrativo, es irrazonable per se cuando se lleve a cabo sin orden judicial previa, "a menos que se consienta al registro, directa o indirectamente, o circunstancias de emergencia requieran lo contrario y el peso de los intereses en conflicto exija una solución distinta". *E.L.A. v. Coca Cola Bott. Co.*, 115 D.P.R. 197, 208 (1984).

Pertinente a esta controversia, nuestra jurisprudencia ha expresado que la Sec. 10 del Art. II de nuestra Constitución, *supra*, prohíbe que el Estado registre irrazonablemente un vehículo de motor. *Pueblo v. Sosa Díaz*, 90 D.P.R. 622 (1964).[6] Constantemente la jurisprudencia federal aplicable ha dictaminado que la detención, por parte del Estado, de una persona que conduce un vehículo de motor constituye una incautación de la persona. Véanse: *Whren v. United States*, 517 U.S. 806 (1996), y *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). De manera que cuando el imputado fue detenido y, con motivos fundados, se incautó el arma de fuego que él transportaba al descubierto en la cabina de su automóvil, éste era recipiente de la protección que nuestra Constitución otorga.

Sin embargo, es imprescindible recordar que en *Pueblo v. Malavé González*, 120 D.P.R. 470, 478 (1988), y en *Pueblo v. Acevedo Escobar*, 112 D.P.R. 770, 775 (1982), reconocimos que el grado de protección constitucional con que cuentan los vehículos de motor contra registros irrazonables no es tan hermético como el escudo de protección que nuestra Constitución le brinda a la morada. Por los motivos expuestos a continuación, esa protección que el imputado llevaba consigo, que le cobijaba como una capa invisible, no invalida el registro de su automóvil bajo los hechos particulares de este caso.

---

[6] Nuestra evaluación constitucional también debe considerar que, como ya se ha hecho claro por nuestra jurisprudencia, el derecho fundamental a la intimidad está garantizado por la Constitución de Estados Unidos y la Constitución de Puerto Rico.

Además, debemos enfocar nuestra aplicación de la Sec. 10, Art. II, *supra*, por medio de lo expresado en *E.L.A. v. P.R. Tel. Co.*, 114 D.P.R. 394, 402 (1983). En esa decisión indicamos que los derechos decretados por dicha sección no son de absoluta aplicación y que, en ciertas acepciones, el Derecho cede ante el interés apremiante del Estado. Véanse, también: *Brown v. Texas*, 443 U.S. 47, 50 (1979); *Delaware v. Prouse*, 440 U.S. 648, 654 (1979); *Camara v. Municipal Court*, 387 U.S. 523, 539 (1967), y J.J. Buslog, Nota, *Exploring the Constitutional Limits of Suspicionless Seizures: The Use of Roadblocks to Apprehend Drunken Drivers*, 71 Iowa L. Rev. 577, 579 (1986).

Al amparo de esa norma doctrinal, hemos resuelto, para efectos de nuestra jurisdicción, que el derecho a la intimidad cede ante el derecho a la libertad de expresión de un candidato a una posición electiva. *Bonilla Medina v. P.N.P.*, 140 D.P.R. 294 (1996). También hemos encontrado que el interés investigativo del Estado en sus funciones administrativas sopesa bajo determinadas circunstancias sobre el reclamo de violación a la intimidad. *E.L.A. v. P.R. Tel. Co.*, supra. Hemos establecido, a su vez, que el derecho a la libertad de prensa, el cual es también de índole constitucionalmente fundamental, prevalece en ciertos contextos sobre el derecho del individuo a su intimidad. *Clavell v. El Vocero de P.R.*, 115 D.P.R. 685 (1984).

Hoy exponemos que la función del Estado de proteger a nuestros ciudadanos de los graves problemas del crimen, las drogas y la delincuencia prepondera sobre una intervención mínima con un conductor de un vehículo de motor para requerirle los documentos pertinentes que le permitan conducir por nuestras vías de tránsito, y que ello no violente el fundamental derecho a la intimidad, aunque el bloqueo se realice coetáneamente con otro operativo de la Policía para diligenciar unas órdenes de allanamiento en el área circundante.

## IV

La jurisprudencia emitida por la mayoría de las jurisdicciones estadounidenses resulta persuasiva al preconizar la constitucionalidad de los bloqueos de las vías públicas de tránsito vehicular.(⁷) La mayoría de las cortes federales que se han pronunciado sobre la constitucionalidad de estos bloqueos los han convalidado.(⁸)

Recientemente, la Corte de Apelaciones de Estados Unidos para el Decimoprimer Circuito concluyó que la Constitución no se interpone a la capacidad de la Policía para bloquear las calles públicas con el fin de revisar las licencias de conducir y el registro de todos los vehículos que transiten por esas vías. *Merret v. Moore*, 58 F.3d 1547 (11mo Cir. 1995). En *United States v. Miller*, 608 F.2d 1089 (5to Cir. 1979), el Quinto Circuito federal de Apelaciones convalidó la legalidad de las actuaciones de unos policías del estado de Texas, al éstos organizar un punto de cotejo de licencias donde se bloqueó el tránsito de la vía pública sin que ningún automóvil fuera exento. Ese tribunal fue enfático en señalar que el bloqueo, al detener todos los carros que transitaban en ambas direcciones de la vía, no

---

(⁷) Nos parece claro que un bloqueo del tipo aludido no violenta las protecciones mínimas exigidas por la Cuarta Enmienda de la Constitución de Estados Unidos. Aunque la jurisprudencia estadounidense estudiada responde a las protecciones concedidas por esa enmienda, sus bases en derecho son tan convincentes que cargan alta persuasividad aun sobre la determinación constitucional de derechos más específicos y protectivos, como los concedidos por la Sección 10 del Artículo II de nuestra Constitución, *supra*.

(⁸) Véanse: *U.S. v. Treviño*, 60 F.3d 333, 336–338 (7mo Cir. 1995); *U.S. v. Holloman*, 908 F. Supp. 917, 920–923 (M.D. Fla. 1995); *U.S. v. Morales-Zamora*, 914 F.2d 200, 202–203 (10mo Cir. 1990); *U.S. v. McFayden*, 865 F.2d 1306 (Cir. D.C. 1989); *U.S. v. Corral*, 823 F.2d 1389, 1392 (10mo Cir. 1987); *U.S. v. Diaz-Albertini*, 772 F.2d 654, 658 (10mo Cir. 1985), *cert.* denegado, 484 U.S. 822; ; *United States v. Lopez*, 777 F.2d 543, 547 (10mo Cir. 1985); *United States v. Obregon*, 748 F.2d 1371, 1376 (10mo Cir. 1984); *Stark v. Perpich*, 590 F. Supp. 1057, 1061–1062 (D. Minn. 1984); *Texas v. Brown*, 460 U.S. 730 (1983); *Garrett v. Goodwin*, 569 F. Supp. 106, 121 (W.D. Ark. 1982); *United States v. Prichard*, 645 F.2d 854, 856–857 (10mo Cir. 1981), *cert.* denegado, 454 U.S. 832 (1982), *reh.* denegado, 454 U.S. 1069 (1981); *United States v. Miller*, 608 F.2d 1089 (5to Cir. 1979), *reh.* denegado, 613 F.2d 315 (5to Cir. 1979), *cert.* denegado, 447 U.S. 926 (1980); *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976); *United States v. Millar*, 543 F.2d 1280, 1282 (10mo Cir. 1976), y *United States v. Croft*, 429 F.2d 884, 886 (10mo Cir. 1970).

contenía una dimensión selectiva, por lo que no estaba prohibido por la Cuarta Enmienda federal. De forma constante, la Corte de Apelaciones de Estados Unidos para el Décimo Circuito encontró razonable un bloqueo similar que llevó a un registro comparable del vehículo en *United States v. Prichard*, 645 F.2d 854, 856–857 (10mo Cir. 1981); *United States v. Obregon*, 748 F.2d 1371, 1376 (10mo Cir. 1984), y *United States v. Lopez*, 777 F.2d 543, 547 (10mo Cir. 1985).

La abarcadora jurisprudencia de los estados, que también ha examinado la constitucionalidad de bloqueos del tipo que nos ocupa hoy, al amparo de la Cuarta Enmienda de la Constitución de Estados Unidos, reitera su constitucionalidad.[9] En *Miller v. State*, 373 So. 2d 1004,

---

[9] Véanse: *State v. Bates*, 902 P.2d 1060 (N.M. App. 1995); *Merrett v. Moore*, supra; *State v. Binion*, 900 S.W.2d 702, 705 (1995); *State v. Loyd*, 530 N.W.2d 708, 711 (1995); *Hooten v. State*, 442 S.E.2d 836, 841-842 (1994); *State v. Rodriguez*, 877 S.W.2d 106, 109 (1994); *People v. Wells*, 608 N.E.2d 578, 581-582 (1993); *Hagood v. Town of Town Creek*, 628 So. 2d 1057, 1059–1062 (1993); *State v. MacDonald*, 856 P.2d 116, 118-119 (Kan. 1993); *State v. Barker*, 850 P.2d 885, 889-890 (Kan. 1993); *People v. Cascarano*, 587 N.Y.S.2d 529 (1992); *Davis v. Kansas Dept. of Revenue*, 843 P.2d 260 (Kan. 1992); *Brunson v. State*, 580 So. 2d 62, 64 (1991); *Galberth v. U.S.*, 590 A.2d 990, 1001 (1991); *Brimer v. State*, 411 S.E. 2d 128, 129-130 (1991); *State v. Sanchez*, 800 S.W.2d 292, 295–297 (1990); *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444 (1990); *Orr v. People*, 803 P.2d 509, 511–512 (Colo. 1990); *State v. Bolton*, 801 P.2d 98, 102 (N.M. App. 1990); *Cains v. State*, 555 So. 2d 290, 296 (1989); *Camp v. State*, 764 S.W.2d 463 (1989); *State v. Gascon*, 811 P.2d 1103, 1105–1008 (Idaho App. 1989); *State v. Mazurek*, 567 A.2d 277, 281 (1989); *State of Missouri v. Payne*, 759 S.W.2d 252, 253 (1988); *Cobey v. State*, 533 A.2d 944, 950 (1987); *State v. Valencia Olaya*, 736 P.2d 495, 497 (N.M. App. 1987); *Smith v. State*, 515 So. 2d 149, 152 (1987); *People v. Little*, 515 N.E.2d 846, 849 (1987); *Cardwell v. State*, 482 So. 2d 512, 515 (1986); *State v. Garcia*, 481 N.E.2d 148, 152, (1985), *reh.* denegado, 489 N.E.2d 168 (1986), *cert.* denegado, 481 U.S. 1014 (1985); *State v. Martin*, 496 A.2d 442, 446 (1985); *People v. Bartley*, 486 N.E.2d 880, 883–885 (1985), *cert.* denegado, 475 U.S. 1068 (1985); *State v. Alexander*, 489 N.E.2d 1093, 1096–1097 (1985); *State v. Cloukey*, 486 A.2d 143, 146–147 (1985); *State v. Deskins*, 673 P.2d 1174, 1184–1185 (Kan. 1983); *State v. Shankle*, 647 P.2d 959 (Or. App. 1982); *State v. Coccomo*, 427 A.2d 131, 132 (1980); *People v. Estrada*, 386 N.E.2d 1228, 1232–1233 (1979), *cert.* denegado, 444 U.S. 968 (1979); *Miller v. State*, 373 So. 2d 1004, 1008 (1979); *Sowers v. State*, 247 S.E.2d 225, 226 (1978); *Irwin v. State*, 383 N.E.2d 1086 (1978); *State v. Frisby*, 245 S.E.2d 622, 625 (1978), *cert.* denegado, 439 U.S. 1127 (1978); *State v. Ruud*, 567 P.2d 496, 498–499 (N.M. 1977); *State v. Bloom*, 561 P.2d 465, 466 (N.M. 1977); *Brantley v. State*, 548 P.2d 675, 676 (Okla. 1976); *State v. Bidegain*, 541 P.2d 971, 974–975 (N.M. 1975); *People v. Ingle*, 36 N.Y.S.2d 413 (1975); *State v. Swift*, 207 S.E.2d 459, 460 (1974); *People v. Andrews*, 484 P.2d 1207, 1209 (Colo. 1971); *People v. Washburn*, 71 Cal. Rptr. 577 (1968); *State v. Severance*, 237 A.2d 683, 685–686 (1968); *State v. Smolen*, 232 A.2d 339, 343–344 (1967), *cert.* denegado, 231 A.2d 283 , *cert.* denegado, 389 U.S. 1044 (1968); *People v. De la Torre*, 64 Cal. Rptr. 804 (Cal. App. 1968); *State*

1008 (1979), la Corte Suprema del estado de Mississipi encontró como constitucional, según la Cuarta y Decimocuarta Enmiendas, que la Policía detenga a todos los vehículos que transiten por una calle pública para cotejar la vigencia de las licencias de conducir de los detenidos mientras se encuentran al volante de un vehículo de motor. En ese caso se arrestó a los ocupantes de un automóvil porque un oficial de la Policía percibió el olor de marihuana que provenía del carro detenido. Véanse, también: *Pueblo v. Acevedo Escobar*, supra, pág. 779; *People v. Wells*, 608 N.E.2d 578, 582 (1993), y *State v. MacDonald*, 856 P.2d 116, 120 (Kan. 1993).

De igual forma, en *State v. Cloukey*, 486 A.2d 143, 146–147 (1985), la Corte Suprema Judicial del estado de Maine encontró que la Policía de ese estado actuó razonablemente, para los efectos de la Cuarta Enmienda, cuando estructuró un bloqueo en una vía pública, la cual fue designada para aminorar el peligro que tal bloqueo podría causarle a quienes transitaban por esa vía. Este caso también se refiere a un bloqueo total del tránsito, en el cual todos los automóviles fueron detenidos. El imputado en ese caso fue detenido y arrestado al no mostrarle su licencia de conducir al oficial que se la pidió.

## V

En cuanto a la constitucionalidad en Puerto Rico de dichos bloqueos, nuestro análisis contiene dos (2) partes. Corresponde primero sopesar las protecciones constitucionales que cobijan al detenido ante los intereses del Estado de llevar a cabo tal detención. Luego de evaluar la calidad apremiante del interés del Estado, mediremos, como segundo paso, la razonabilidad del operativo efectuado con el propósito de determinar si éste fue intrusivo a un grado inaceptable.

*v. Kabayama*, 236 A.2d 164, 165–166 (1967), affd., 246 A.2d 714 (1968); *Morgan v. Town of Heidelgberg*, 150 So. 2d 512, 515 (1963), y *Commonwealth v. Mitchell*, 355 S.W.2d 686 (1962).

Antes de entrar al primer escalón de ese esquema analítico es menester enfatizar nuestro firme apoyo a los derechos constitucionales, por estos proteger a nuestro pueblo de atropellos que podrían cometerse en su contra por el Estado. No obstante, cuando la acción del Estado no llega al punto inaceptablemente ofensivo de constituir un atropello, otras consideraciones entran en juego, como lo son los intereses del Estado en beneficio de sus integrantes. A esos efectos, y con pertinencia al caso de autos, la obligación más importante que tiene el Estado es hacer lo permisible para proteger la vida, propiedad y libertad de las personas a su amparo. Para ese cometido, el Estado está autorizado por nuestras leyes para establecer bloqueos de vías públicas como el que examinamos hoy.

Examinemos la sustancia del interés del Estado en el caso de autos para verificar su condición apremiante.

Es de conocimiento general que uno de los problemas sociales que más agobia a nuestro pueblo es la criminalidad. Los cambios sociales de las últimas décadas han traído consigo problemas de convivencia en las áreas de gran concentración poblacional. Prominentes entre los síntomas y las causas de estos problemas están el peligro, la anarquía y la entropía presentadas por la criminalidad. La criminalidad, sobre todo la vinculada al tráfico ilícito de drogas y al crimen organizado, como todo mercado competitivo, se expande y evoluciona; las operaciones de este mercado se desarrollan de formas cada vez más dañinas para nuestro pueblo. Al evolucionar los métodos utilizados para cometer delitos, para los cuales se utiliza tecnología cada vez más avanzada, la Policía se ve obligada a reciprocar con medidas innovadoras y firmes para combatir las nuevas caras de la criminalidad.

Es menester entender que, dado el desarrollo de la actividad criminal relacionada a gran escala con el mercado de sustancias controladas, las medidas tradicionales de patrullaje constante se han tornado inefectivas en controlar el crimen, por lo que en los últimos años las fuerzas policíacas han emprendido operativos diseñados para contro-

lar la ola criminal antes de que cause más daño en la orilla. Véanse: C.P. McDowell, *Police in the Community*, Nueva York, Ed. McMillan, 1975, pág. 112., y P.K. Manning, *Police Work: The Social Organization of Policing*, Cambridge, M.I.T. Press, 1947, pág. 348. Entre las medidas adoptadas para combatir el crimen en las áreas denominadas como de mayor incidencia criminal se encuentran las patrullas de saturación y los bloqueos de vías públicas, para los cuales se han utilizado desde helicópteros hasta la Guardia Nacional. S. Mydans, *Powerful Arms of Drug War Arousing Concern for Civil Rights*, The New York Times, Oct. 16, 1989. El uso de bloqueos de vías públicas es una táctica relativamente nueva en la guerra contra el crimen, la cual presenta varios beneficios.[10]

En particular, el Gobierno tiene un interés apremiante en proteger a las personas de aquellos que conducen vehículos de motor sin estar debidamente autorizados para llevar a cabo esa operación potencialmente peligrosa. Ese interés es suficientemente importante como para justificar que el Estado establezca bloqueos en las vías públicas para identificar a aquéllos que violen las leyes de tránsito. Véase *U.S. v. McFayden*, 865 F.2d 1306 (Cir. D.C. 1989).

En cuanto a las vías públicas, el Estado regula, controla y limita su uso con el fin de mantener y promover la seguridad de las personas que a diario transitan por ellas. 37 A.L.R.4th 10 (1985); 7A Am Jur 2d Sec. 101. Con ese fin, la Ley Núm. 141 de 20 de julio de 1960 (9 L.P.R.A. sec. 301 *et seq.*), según enmendada, requiere que el Gobierno califique, a través de la expedición de licencias, a las personas que les está permitido conducir y requiere que los vehícu-

---

[10] Un comentarista ha señalado que cada vez que las fuerzas de la Policía intentan adoptar medidas innovadoras para combatir las evolucionantes formas de actividad criminal, se encontrarán con gran oposición. A.L. Meiring, Nota, *Walking the Constitutional Beat: Fourth Amendment Implications of the Police Use of Saturation Patrols and Roadblocks*, 54 Ohio St. L.J. 497, 520, 535 (1993). Entendemos que la oposición mencionada es útil y necesaria en nuestro sistema democrático y pluralista, pero ello no significa que sólo por una táctica ser nueva, ella debe ser descontinuada. Esa actitud tan conservadora restringiría indebidamente al Estado y sería contraproducente al bien común.

los de motor estén debidamente registrados en el Departamento de Transportación y Obras Públicas.

El Estado tiene, además, un interés apremiante de restringir el robo de vehículos de motor mediante las medidas investigativas disponibles. El bloqueo de vías públicas que se efectúa para cotejar que los documentos que requiere la ley para el tránsito de vehículos de motor estén en orden es un operativo eficaz incluyendo, entre otros, la identificación y el arresto de aquellos que conducen vehículos de motor hurtados.

Para entender la utilidad de los bloqueos de tránsito en vías públicas, basta comprender que la transportación automovilística le permite al criminal expandir su área de operaciones. Hemos reconocido la triste realidad de que "dada su movilidad[,] el automóvil en ocasiones es el remedio utilizado por los delincuentes para sus actividades ilícitas". *Pueblo v. Malavé González*, supra, pág. 479.

En términos generales, los bloqueos de vías de tránsito tienen el efecto de reducir la actividad criminal. Este es el llamado *deterrent effect*. Buslog, *op. cit.*, pág. 593. Para los involucrados en actividades de índole criminal, los bloqueos aumentan el riesgo de ser arrestados, pues éstos no pueden predecir cuándo y dónde se les detendrá para revisar su licencia de conducir y los documentos del vehículo. Examinar los documentos de tránsito mediante un bloqueo de vías públicas, para imponer el cumplimiento de las leyes de tránsito, también le brinda a la Policía la oportunidad de identificar y actuar en contra de aquellos delincuentes que se dirigen en un automóvil a cometer actos delictivos. Hacer inefectivo este producto derivado de tales bloqueos es producirle una herida mortal a la propia comunidad: una herida autoinfligida.

En fin, el objetivo de los mencionados bloqueos es proteger la sociedad puertorriqueña[11] y, en específico, a aque-

---

[11] Además, la inspección de los documentos que requiere la ley para conducir un vehículo de motor le brinda a la Policía la oportunidad de percatarse de si la persona detenida esta conduciendo bajo estado de embriaguez.

llas personas que residen en el área designada.([12]) Los pa-
rámetros constitucionales permiten que los bloqueos de
vías públicas sean efectuados con estos fines. El hecho de
que simultáneamente se estuvieran diligenciando unas ór-
denes de allanamiento en el Residencial Virgilio Dávila no
desvirtúa la validez constitucional del bloqueo efectuado
en su periferia.

Nos compete hoy lograr un balance de intereses entre
los del conductor que transita por una vía pública y los del
Estado en bloquear su paso para el bien de la comunidad.
Dentro del contexto enmarcado por los hechos de este caso,
los del Estado, para el bien de la comunidad, claramente
prevalecen.

## VI

Aun cuando los intereses del Estado sean apremiantes,
como claramente lo son en este caso, debemos evaluar si la
acción emprendida es razonable.([13]) Veamos.

---

. In sum, the balance of the State's interest in preventing drunken driving, the
extent to which this system can reasonably be said to advance that interest, and the
degree of intrusion upon individual motorists who are briefly stopped, weighs in
favor of the state program... [I]t is consistent with the Fourth Amendment. *Michigan
Dept. of State Police v. Sitz*, supra, pág. 455.

([12]) La mayoría infiere que el único resultado de que se bloqueen las calles que
dan acceso a una comunidad sería que la Policía someta a los integrantes de ésta a
una vigilancia más minuciosa que la que se le impondría a los residentes de otras
comunidades. Lo cierto es lo contrario. El bloqueo efectuado en las vías de acceso y
salida de una comunidad sirve para promover la seguridad y el bienestar de sus
miembros, al éstos recibir mayor vigilancia policíaca para prevenir el crimen. Aparte
de que tales bloqueos pueden proteger a esa comunidad de visitantes, extraños o
intrusos que se acercan a ella con propósitos delictivos.

([13]) Nuestra Constitución acoge el derecho a la intimidad de forma expresa en
su propio texto, a diferencia de la Constitución federal en que este derecho se deriva
e infiere de otros tales como el debido proceso de ley, la igual protección de las leyes,
la Cuarta Enmienda y varios otros, pero ambas operan bajo el axioma de que el
registro es inconstitucional si es irrazonable.

En *Pueblo v. Dolce*, 105 D.P.R. 422, 429 (1976), dictaminamos, sobre la Sec. 10,
Art. II de nuestra Constitución, *supra*, y la Cuarta Enmienda de la Constitución
federal, *supra*, que, aunque análogas, "[a]mbas disposiciones respondieron a circuns-
tancias diferentes y es natural que su interpretación se atenga, dentro del marco de
nuestras relaciones con Estados Unidos, a las realidades cambiantes de una y otra
sociedad". Por tal razón tenemos la potestad de, al interpretar los derechos y las
garantías que concede nuestra Constitución, ampliar las protecciones de ellas sobre

La abundante jurisprudencia estadounidense ha fijado los criterios para evaluar la razonabilidad de los bloqueos de tránsito vehicular. Entendemos que en *State v. Deskins*, 673 P.2d 1174 (Kan. 1983), la Corte Suprema del estado de Kansas fue abarcadora y atinada en su desglose de los factores que se han de considerar. Esos factores son los siguientes:

> ... (1) The degree of discretion, if any, left to the officer in the field; (2) the location designated for the roadblock; (3) the time and duration of the roadblock; (4) standards set by superior officers; (5) advance notice to the public at large; (6) advance warning to the individual approaching motorist; (7) mainte- nance of safety conditions; (8) degree of fear or anxiety genera- ted by the mode of operation; (9) average length of time each motorist is detained; (10) physical factors surrounding the lo- cation; (11) the availability of less intrusive methods for com- bating the problem; (12) the degree of effectiveness of the pro- cedure; and (13) any other relevant circumstances which might bear upon the test. *State v. Deskins*, supra, pág. 1185.[14]

Estos factores son determinantes. Procedemos entonces a aplicar los más pertinentes al bloqueo que dio paso al caso de autos.

Para aminorar el grado en que los operativos de bloqueo puedan infligir los derechos constitucionales, se requiere que el bloqueo sea efectuado sin que los agentes determi- nen de forma arbitraria cuáles vehículos han de ser detenidos. *State v. Binion*, 900 S.W.2d 702, 705 (1995), y *People v. Little*, 515 N.E.2d 846, 848–849 (1987). El blo-

---

los derechos mínimos dispuesto por la Constitución federal. Sin embargo, no coinci- dimos con la proposición de la mayoría de que tal competencia constituye una base lógica para interpretar que "en nuestra jurisdicción el criterio de razonabilidad es más estricto". El Diccionario de la Lengua Española asocia lo "razonable" con lo "justo", lo "conforme a razón". *Diccionario de la Lengua Española*, 21ra ed., Madrid, Ed. Espasa-Calpe, 1992, pág. 1228. Esa es la perspectiva con que medimos las accio- nes del Estado para juzgar si cumplen con nuestros valores. Razonabilidad es razo- nabilidad, independientemente de si la protección de la intimidad es de rango direc- tamente constitucional, como en el caso nuestro, o derivado de otros derechos constitucionales como en el caso de la Constitución federal.

[14] Los factores esbozados en *State v. Deskins*, supra, han sido adoptados y aplicados por numerosas jurisdicciones. Véanse, por ejemplo: *State v. MacDonald*, supra, págs. 118–119; *People v. Little*, supra, págs. 848–849; *State v.Super. Ct. in & for County of Pima*, 691 P.2d 1073, 1077 (Ariz. 1984); *Ingersoll v. Palmer*, supra, pág. 1313, y *State v. Valencia Olaya*, supra, pág. 498.

queo que evaluamos, como se explicó anteriormente, fue total: se detuvieron *todos* los vehículos que transitaban por la vías bloqueadas.([15]) Lo que quiere decir, tomando las palabras de la mayoría, que existían "criterios objetivos" (detener a todos los vehículos para verificar la validez de sus documentos de tránsito como lo requiere la ley), que eliminaban "la arbitrariedad por parte de los agentes estatales".

Debemos considerar, además, si el bloqueo fue irrazonablemente intrusivo contra el imputado. Ciertamente, el hecho de que se le ordene detener su marcha no es irrazonablemente intrusivo sobre el imputado. Tampoco fue inaceptablemente intrusivo el hecho de que la Policía le pidiera que mostrara su licencia de conducir y el registro del automóvil que ocupaba. Claramente, estos hechos son incapaces de formular una impresión de que el bloqueo sometió al imputado a un trato o a una inspección extrema o agraviante.

En cuanto a la potestad de la Policía de Puerto Rico, como agencia gubernamental, para implementar medidas de bloqueos de tránsito, nos parece claro que la Policía cuenta con esa discreción.([16]) En cuanto a la autoridad de la Policía para detener un automóvil con el propósito de cotejar la vigencia de la licencia del conductor y el debido registro del vehículo, veáse la Sec. 5–1120(a) de la Ley Núm. 141 de 20 de julio de 1960, según enmendada por la Ley Núm. 58 de 30 de mayo de 1973 (9 L.P.R.A. sec. 1152(a)), conocida como la Ley de Vehículos y Tránsito de Puerto Rico. Esa sección dispone que:

---

([15]) Aunque la mayoría en su decisión desenfatiza el hecho de que la Policía se encontraba deteniendo cada uno de los automóviles que transitaban por esas calles, entendemos que la naturaleza indiscriminada de la detención, y el hecho de que la Policía no actuó con discreción descontrolada, son factores esenciales que se han de considerar al determinar la constitucionalidad del procedimiento llevado a cabo. Véase Meiring, *op. cit.*, pág. 520.

([16]) Refiriéndose a bloqueos efectuados por policías estatales para identificar conductores ebrios, es pertinente notar que el Tribunal Supremo federal convalidó uno de estos operativos, aun cuando la Legislatura del correspondiente Estado nunca se pronunció sobre éste. Por lo tanto, es lógico concluir que ese Tribunal entendió que, aunque el bloqueo sea una iniciativa administrativa y no legislativa, éste no está prohibido constitucionalmente. Véase *Michigan Dept. of State Police v. Sitz*, supra.

Todo conductor de vehículos deberá detenerse inmediatamente cuando un agente del orden público así lo requiere y vendrá obligado igualmente a identificarse con dicho agente si éste se lo solicitare, y también deberá mostrarle todos los documentos que de acuerdo con este Capítulo y sus reglamentos deba llevar consigo o en el vehículo. 9 L.P.R.A. sec. 1152(a).[17]

Ante lo establecido por la Asamblea Legislativa mediante esa sección de la Ley de Vehículos y Tránsito de Puerto Rico, es inevitable concluir que la Policía actuó de conformidad al derecho aplicable al detener el auto del imputado y solicitarle su licencia de conducir y el registro del vehículo.

En relación a la localización y duración del bloqueo, entendemos que también fueron razonables. Hemos expresado antes que el hecho de que simultáneamente con el bloqueo se estuvieran diligenciando ciertas órdenes de allanamiento en el Residencial Virgilio Dávila no convierte en irrazonable un bloqueo en dicha área para examinar el cumplimiento con las leyes de tránsito. No surge, además, de los autos que la duración del bloqueo fuera irrazonable.

En cuanto al grado de instrucción y preparación que recibieron los policías para efectuar el operativo,[18] se desprende de la prueba presentada que los oficiales de la Policía fueron adecuadamente instruidos sobre el particular. En específico, el policía estatal Héctor Ruiz García en su testimonio señala que los supervisores le informaron a los policías que debían detener brevemente a todo vehículo y examinar las licencias de conducir y del vehículo. Alegato del peticionario, pág. 4.[19]

---

[17] En su Resolución de 10 de noviembre de 1993, el Tribunal Superior, Sala de Bayamón, decretó que esta disposición de ley es también inconstitucional porque ella le brinda a la Policía la capacidad de arbitrariamente intervenir con vehículos sin tener motivos fundados. Sin embargo, para llegar a la determinación apropiada en el caso de autos, no es necesario dictaminar sobre la constitucionalidad de ese artículo de la Ley de Vehículos y Tránsito de Puerto Rico, ya que al convalidar el bloqueo como constitucional se hace legal la cadena de eventos que culminó en la observación a plena vista del arma de fuego.

[18] Véase *Garrett v. Goodwin*, supra, pág. 121.

[19] En su decisión, la mayoría sugiere que el bloqueo de tránsito en controversia se efectuó con el objetivo principal de encontrar a cualquiera que haya cometido un

La ansiedad que surge en todo conductor al ser ordenado a detenerse por un oficial de la ley es un factor que consideramos importante. En *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976), el Tribunal Supremo federal consideró el efecto subjetivo que un bloqueo podría tener en la mente y psique del conductor detenido. Véanse, también: *State v. MacDonald*, supra, págs. 118–119, y *State v. Coccomo*, 427 A.2d 131, 135 (1980). En *United States v. Martinez-Fuerte*, supra, ese tribunal encontró que este tipo de bloqueo automovilístico no causa un agravio en la mente del conductor, ya que el operativo efectuado en una vía pública no toma al detenido por sorpresa. *United States v. Martinez-Fuerte*, supra, pág. 559.[20] El Tribunal también dispuso que la forma pública en que estos bloqueos se llevan a cabo crea en el conductor un sentido de seguridad, al éste poder percatarse de que miembros de la Uniformada están deteniendo otros conductores en el mismo sector. *United States v. Martinez-Fuerte*, supra, pág. 559. A este respecto, varias jurisdicciones y comentaristas han favorecido el uso de los bloqueos de vías públicas porque éstos son una manera de cotejar el cumplimiento con las leyes de tránsito que no crea el instintivo temor descrito. Véanse: *Michigan Dept. of State Police v. Sitz*, supra, pág. 486, y Buslog, *op. cit.*, págs. 603–604.

Otro factor que se ha de considerar para determinar la razonabilidad del bloqueo de vías públicas es su eficacia en atender el interés deseado y por el cual se ejecutó el operativo. En Estados Unidos, los bloqueos del tránsito en

---

delito. De ese haber sido el propósito del bloqueo, éste sería irrazonable, dada la falta de motivo fundado. Esa perspectiva no altera nuestro análisis constitucional, ya que la mayoría se equivoca. Ése no fue el propósito del bloqueo de tránsito que nos ocupa hoy. Durante el bloqueo, los policías se limitaron a acatar sus órdenes de solicitar a los conductores de los vehículos detenidos sus licencias de conducir y las licencias del registro de los vehículos. Por lo tanto, nos parece claro que el propósito del bloqueo era meramente detectar violaciones específicas de la Ley de Vehículos y Tránsito de Puerto Rico. Alegato del peticionario, pág. 4.

[20] Sobre este particular, la opinión de la mayoría menciona que, para ser razonable, el bloqueo debe ser "claramente visible." Así lo fue el bloqueo que nos ocupa. Éste fue efectuado durante una mañana en calles transitadas, por lo que concluimos que el bloqueo cumplió con ese requisito.

vías públicas han probado ser exitosos en combatir el tráfico de drogas controladas; los crímenes violentos cometidos por gangas; la identificación de personas que estén conduciendo bajo los efectos del alcohol, y la inmigración ilegal de extranjeros, ello como producto derivado. *Galberth v. United States*, supra; *Michigan Dept. of State Police v. Sitz*, supra; *United States v. Martinez-Fuerte*, supra; Meiring, *op. cit.*, y R. Holguin, *Roadblocks to Curb Gangs to be Set Up in Paramount*, L.A. Times, Aug. 9, 1991, pág. A1.

Entre los factores que se han de aplicar en cuanto a la razonabilidad del bloqueo se encuentra la interrogante de si el Estado cuenta con métodos menos intrusivos a través de los cuales llegar al mismo cometido. *Delaware v. Prouse*, supra, págs. 659–660. No resulta convincente el argumento que plantea que los bloqueos de vías públicas no constituyen la única manera de atender con efectividad los intereses del Estado. Véase N. Strossen, *Michigan Department of State v. Sitz: A Roadblock to Meaningful Enforcement of Constitutional Rights*, 42 Hastings L.J. 285, 306 (1991). Es amplio el reconocimiento del bloqueo como medio efectivo para lograr sus propósitos y, aunque existan otros métodos menos intrusivos, éstos no han probado tener la misma efectividad. Además, ello no significa que el bloqueo sea irrazonablemente intrusivo, en particular si se efectúa con prontitud y sin discrimen.

Incluso, un bloqueo de carreteras públicas para inspeccionar la validez y vigencia de las licencias de conducir y de registro del vehículo es menos intrusivo que los bloqueos vehiculares efectuados para identificar a personas que estén conduciendo bajo estado de embriaguez. Aun ese tipo de bloqueo, el cual con frecuencia requiere someter al conductor a una prueba mental o física, o a la observación minuciosa de su comportamiento,[21] fue encontrado constitucionalmente válido por el Tribunal Supremo de Estados Unidos en *Michigan Dept. of State Police v. Sitz*, supra. En *Sitz*, dicho Tribunal determinó que el interés del Estado en

---

[21] Véase, también, *Jones v. State*, 459 So. 2d 1068 (1984).

combatir el delito de conducir bajo estado de embriaguez y el interés de acumular evidencia para atender convicciones son apremiantes y justifican la ejecución de estos bloqueos. Mediante su decisión, esa honorable curia le otorgó una clara deferencia a los oficiales dirigentes de las fuerzas policiacas en cuanto a la determinación de utilizar las medidas necesarias, razonables y constitucionalmente permisibles para llevar a cabo su imperativa función.

## VII

La opinión mayoritaria se concentra en la premisa de que la detención del automóvil del imputado no procedía en derecho, ya que los oficiales no contaban con motivos fundados para individualmente acercarse al vehículo y percatarse de lo que se encontraba a simple vista en su interior. En esa proposición se equivoca la mayoría.

Persuasivamente, el Tribunal Supremo federal ha dispuesto que ciertos tipos de bloqueos de tránsito no requieren motivos fundados para efectuar la detención del vehículo. *Michigan Dept. of State Police v. Sitz*, supra, pág. 456, y *United States v. Martinez-Fuerte*, supra, pág. 556. Para concluir lo anterior, el Tribunal federal consideró: (1) la importancia del interés gubernamental perseguido por el bloqueo; (2) el grado a que tal bloqueo avanza dicho interés apremiante, y (3) el grado intrusivo del bloqueo efectuado. Esos criterios fueron esbozados primero en *Brown v. Texas*, supra, págs. 50–51, y fueron posteriormente aplicados para medir la constitucionalidad de bloqueos de tránsito vehicular. También son equivalentes a los discutidos sobre la legalidad de los bloqueos de vías públicas, por lo que no es necesario expresarnos de nuevo al respecto.

La mayoría también se equivoca al sostener que el bloqueo llevado a cabo en este caso "se asemeja" a los bloqueos criticados por el profesor LaFave de la manera siguiente:

It is not permissible for the police to celebrate Burglary Pre-

vention Week by setting up random roadblocks *to search cars for burglary tools*, to blockade a highcrime area of that city *and search all cars leaving that area*, or to establish roadblocks "to curb the juvenile problem" or for the purpose of "deterring drug traffic and violence". Such tactics as these pose "the most serious threat to the interest of privacy". (Énfasis suplido.) W.R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, 3ra ed., Minnesota, Ed. West Publishing Co., 1996, Vol. 4, págs. 313–314.

Independientemente de si esos tipos de bloqueos presentan el peligro descrito, ellos no son comparables al efectuado en el caso de autos. Del expediente se desprende que la Policía de Puerto Rico no bloqueó las calles *para registrar todos los automóviles*, sino para cotejar el cumplimiento de las leyes de tránsito por sus conductores, simplemente requiriendo la licencia de conductor y la del vehículo.

Conviene corregir, además, el error cometido por el tribunal de instancia en cuanto a que la decisión de *Delaware v. Prouse*, supra, establece una norma de derecho dominante sobre el caso de autos. Esa decisión tiene que ser interpretada de manera estricta a la acepción sobre la que el tribunal allí se expresó.

En el citado *Delaware v. Prouse,* el Tribunal Supremo federal se enfrentaba a la constitucionalidad de un bloqueo del tránsito vehicular patentemente diferente al que efectuó la Policía de Puerto Rico en el caso de autos. En *Delaware v. Prouse,* supra, los policías arbitrariamente seleccionaban vehículos de los que transitaban por la vía bloqueada y procedían a registrarlos. El policía, cuya conducta fue evaluada por ese Tribunal federal, explicó, durante su testimonio, que "vio el vehículo durante un período desocupado, por lo que decidió detenerlo". (Traducción nuestra.) *Delaware v. Prouse*, supra, págs. 650–651. En *Prouse* se decidió que lo allí ocurrido constituía un *random spot-check.* Entendemos, como lo hizo el Tribunal Supremo federal, que una detención bajo esas circunstancias es inconstitucional.

En el caso de autos, por el contrario, se desprende del expediente que los policías se encontraban deteniendo a *todos* los vehículos que intentaban salir o entrar del residencial.(²²) Por lo tanto, los policías involucrados en el caso de autos no determinaban individualmente qué automóviles serían inspeccionados para verificar su cumplimiento con las leyes de tránsito, sino que se detuvo a cada automóvil en la vía pública bloqueada con el propósito de confirmar la legalidad de su inscripción y la de la licencia del conductor.

Es el propio Tribunal Supremo federal el que, previendo una controversia legal como la acontecida en el caso de autos, establece la distinción entre los dos (2) procedimientos investigativos. Dijo ese Tribunal, justificando la legalidad de la detención de todos los vehículos en una vía pública:

> ... This holding does not preclude ... any ... [state] from developing methods for spot checks that involve less intrusion or does not involve the unconstrained exercise of discretion. *Questioning of all oncoming traffic at roadblock-type stops is one possible alternative.* (Escolio omitido y énfasis suplido.) *Delaware v. Prouse*, supra, pág. 663.

## VIII

Por otra parte, en su decisión, la mayoría de nuestro Tribunal expresa:

> Cada bloqueo debe ser evaluado de forma individual para determinar si se ajusta a las exigencias constitucionales de nuestro ordenamiento y si, en el balance de intereses, resulta razonable un menor alcance de la protección constitucional ante el interés público involucrado. (Énfasis suprimido.) Opinión mayoritaria, pág. 411.

---

(²²) También compete señalar que *Delaware v. Prouse*, supra, se refiere a un bloqueo del tránsito de una autopista y no de una calle de acceso a un área residencial, como en el caso de autos. Íd., pág. 650. Por lo tanto, el bloqueo efectuado en *Prouse* no tenía entre sus propósitos el interés apremiante del Estado de proteger a los residentes de una comunidad por ésta haber sido particularmente azotada por la ola criminal.

Deseamos el tipo de economía en nuestro derecho que no requiera el singularizar cada bloqueo para evaluarlo constitucionalmente. Entendemos que un procedimiento eficiente para determinar la constitucionalidad de un bloqueo sería la reglamentación de éstos para así mantener un procedimiento uniforme y no caprichoso en su ejecución.[23] Esa reglamentación le compete a la Asamblea Legislativa y a las agencias pertinentes, pero sugerimos que la reglamentación de un procedimiento uniforme de bloqueo apoyaría su constitucionalidad. Véanse: *State v. Loyd*, 530 N.W.2d 708, 712–713 (1995), y *State v. Bernier*, 486 A.2d 147 (1985). Naturalmente, correspondería a los tribunales determinar la validez de cualquier ley o reglamentación a la luz de los preceptos constitucionales aplicables y atender el reclamo de imputados o acusados de violación a la ley sobre si procede la supresión de evidencia, dependiendo de las circunstancias de cada caso en particular.

## IX

Siendo la intervención de la Policía al detener el automóvil del imputado, como uno de todos los detenidos en ese bloqueo, válida constitucionalmente, la incautación del arma de fuego que el imputado llevaba visiblemente en su vehículo también lo fue.

---

[23] Aunque el operativo efectuado en este caso no contuvo faltas inconstitucionales, coincidimos con la mayoría en que en el futuro se necesitan criterios objetivos para eliminar cualquier arbitrariedad por parte de los agentes estatales. Criterios como la raza, el sexo o la edad de los ocupantes son claramente insostenibles. También nos consterna, como a la mayoría, que un bloqueo del tipo que nos ocupa podría ser manipulado por la Policía como un instrumento de subterfugio para actuar caprichosamente sobre los derechos de los tripulantes de los vehículos que habrán de ser detenidos. Sería iluso pensar que las fuerzas policiacas no podrían utilizar un operativo de bloqueo para hostigar o investigar arbitrariamente.

Por entender que estos procedimientos podrían corromperse de esa forma, sería posiblemente deseable que la Asamblea Legislativa y las agencias de gobierno pertinentes adopten un procedimiento uniforme para todos los bloqueos efectuados. Tal vez sea conveniente la adopción de medidas para cerciorarse que el bloqueo se esté llevando a cabo de una manera razonable. Por ejemplo, en *Igersoll v. Palmer*, 743 P.2d 1299 (Cal. 1987), el bloqueo examinado contaba con personal asignado para tomar el tiempo de la detención, velando que éste no se tornara irrazonable.

De la transcripción de evidencia sobre la vista celebrada el 28 de septiembre de 1993, para discutir la moción de supresión de evidencia presentada por el imputado, sabemos que el tribunal de instancia encontró, sobre los hechos, que el policía estatal Ruiz García, después de percatarse de la incompatibilidad en los documentos de tránsito suministrados por el imputado, miró hacia el interior del automóvil detenido, observando así la presencia del arma a simple vista. Sobre ese hecho, citamos al Hon. Juez Ramón R. Gómez Colón, quien presidió la vista y emitió la resolución correspondiente: "Yo no tengo duda de que fue así." Transcripción de evidencia, pág. 3.

Hemos definido que para que un oficial de la ley tenga "motivos fundados" para llevar a cabo un registro sin orden judicial, éste debe haber recibido "aquella *información y conocimiento* que lleven a una persona ordinaria y prudente a creer que el arrestado ha cometido un delito". (Énfasis en el original.) *Pueblo v. Martínez Torres*, 120 D.P.R. 496, 504 (1988).([24])

Examinemos la información con la que contaba el policía estatal Héctor Ruiz García sobre si el registrado había cometido un delito. El agente de la Policía observó a plena vista el arma, teniendo por ello motivos fundados para sospechar que el imputado había cometido un delito. Véase *State v. Bidegain*, 541 P.2d 971, 974–975 (N.M. 1975). En *Pueblo v. Dolce*, 105 D.P.R. 422, 436 (1976), se establecieron los requisitos siguientes para la doctrina de la prueba ilegal a plena vista: (1) el artículo debe haberse descubierto por estar a plena vista y no en el curso o por razón de un registro; (2) para que el agente observe la prueba debe haber tenido derecho previo a estar en una posición desde la cual podía verse la prueba; (3) debe descubrirse el objeto inadvertidamente, y (4) la naturaleza delictiva del objeto debe surgir de la simple observación.

En el caso de autos, luego de que se percatara de una sospechosa incompatibilidad entre el número de la tablilla

---

([24]) Véase, también, *Pueblo v. González Rivera*, 100 D.P.R. 651, 654–655 (1972).

del automóvil y el que aparecía en su certificado de registro, el policía Ruiz García descubrió la pistola por ella haber estado al descubierto entre los asientos delanteros del vehículo que conducía el imputado. No hay evidencia que sugiera que la Policía sabía que el imputado transportaba en su carro la aludida arma de fuego, ni que la estaba buscando de una manera particular. Nos parece obvio que una pistola de alto calibre en un vehículo de motor es un objeto cuya observación sugiere su naturaleza delictiva. Claramente, la doctrina de prueba ilegal a plena vista aplica.

Por lo expuesto, juzgamos que se procedió conforme a derecho al arrestar al imputado. Anteriormente, hemos determinado que un agente puede arrestar a un acusado e incautar su arma, si éste no presenta documentación válida para ella. *Pueblo v. Del Río*, 113 D.P.R. 684, 690 (1982). Por supuesto, el próximo escalón lógico es que, una vez se arrestó al imputado por posesión ilegal de un arma de fuego, procedió el registro de su persona, lo que llevó a la ocupación de la heroína que cargaba el imputado en su bolsillo. Véase E.L. Chiesa Aponte, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1991, Vol. 1, Sec. 6.14, pág. 409.

A esos efectos, la jurisprudencia de Estados Unidos ha señalado que si durante un bloqueo constitucional del tránsito de una vía pública el oficial de la Policía detecta evidencia criminal, éste debe investigarla y no "cerrar sus ojos" sólo porque la función original del bloqueo era cotejar el cumplimiento de las leyes de tránsito. Véanse: *United States v. Merryman*, 630 F.2d 780, 782–785 (10mo Cir. 1980); *United States v. Miller*, supra; *State v. MacDonald*, supra, pág. 119, y *State v. Bolton*, 801 P.2d 98, (*cert.* denegado (N.M. 1990)).

## X

Se ha dicho que quien está dispuesto a sacrificar libertad por seguridad no merece ni libertad ni seguridad. Hoy

nos pronunciamos siguiendo ese sabio pensamiento. La peligrosa criminalidad que nos afecta no amerita la suspensión, en ningún grado, de las protecciones que concede nuestra Constitución.

Hoy disentimos porque el bloqueo ejecutado por la Policía en esa mañana de 16 de abril del 1993, simplemente, no se excedió de los parámetros que nuestra Constitución exige como de mínimo cumplimiento. El interés apremiante del Estado de que se cumpla con las leyes de tránsito, de combatir la criminalidad y de mantener el orden público justifica el bloqueo del tránsito automovilístico efectuado. Lo esencial es que estas medidas se lleven a cabo de forma correcta y razonable, como lo fue el bloqueo que evaluamos hoy.

El bloqueo emprendido por la Policía está en armonía con nuestra Constitución y, ante tal constitucionalidad, la mayoría de este Tribunal está invalidando, mediante su opinión, un instrumento diseñado para fomentar la seguridad pública tan amenazada por la criminalidad. Sin motivo constitucional, nuestro Tribunal hoy aleja al Estado de poder cumplir con su propósito de proteger a la ciudadanía y mantener la paz pública.